E. MARTIN ESTRADA
United States Attorney
SEAN D. PETERSON
Assistant United States Attorney
Chief, Riverside Branch Office
ROBERT S. TRISOTTO (Cal. Bar No. 314178)
SONAH LEE (Cal. Bar No. 246024)
Assistant United States Attorneys
Riverside Branch Office
    3403 Tenth Street, Suite 200
    Riverside, California 92501
    Telephone: (951) 276-6211/6924
    Facsimile: (951) 276-6202
    E-mail:   Robert.Trisotto@usdoj.gov
             Sonah.Lee@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>         v.<br><br>STEFANI KASEY MARIE STEVENS,<br><br>       Defendant. | ED CR No. 19-00377-VAP<br><br>UNITED STATES' INITIAL<br>CLOSING BRIEF |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Robert S. Trisotto

///

///

1  and Sonah Lee, files its initial closing brief in accordance with

2  the Court's October 19, 2022 Order.  (ECF No. 90.)

3  Dated: October 21, 2022          Respectfully submitted,

4                                   E. MARTIN ESTRADA
                                     United States Attorney
5
                                     SEAN D. PETERSON
6                                    Assistant United States Attorney
                                     Chief, Riverside Branch Office
7
                                          /s/
8                                    _____
                                     ROBERT S. TRISOTTO
                                     SONAH LEE
9                                    Assistant United States Attorneys

10                                   Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.   THE UNITED STATES PROVED BEYOND A REASONABLE DOUBT THAT
     DEFENDANT WAS GUILTY OF COUNTS ONE THROUGH NINE OF THE
     FIRST SUPERSEDING INDICTMENT....................................1

II.  COUNT ONE:  DEFENDANT OBTAINED CUSTODY AND CONTROL OF
     VICTIM A WITH THE INTENT TO PRODUCE CHILD PORNOGRAPHY..........2

III. COUNTS TWO THROUGH SEVEN:  DEFENDANT PRODUCED CHILD
     PORNOGRAPHY OF VICTIM A AND VICTIM N..........................22

IV.  COUNT EIGHT:  DEFENDANT DISTRIBUTED TWO CHILD PORNOGRAPHY
     IMAGES OF VICTIM A ON JUNE 28, 2019...........................23

V.   COUNT NINE:  DEFENDANT POSSESSED OVER 1,700 CHILD
     PORNOGRAPHY VIDEOS AND IMAGES IN HER MEGA ACCOUNT.............24

VI.  CONCLUSION...................................................25

i

1

**TABLE OF AUTHORITIES**

2  Cases

3  *Griffith v. United States,*

4    2005 WL 245071 (S.D.N.Y. Oct. 6, 2005) ........................ 17

5  *United States v. Ballinger*,

6    395 F.3d 1218 (11th Cir. 2005) ........................... 15, 16

7  *United States v. Clemans,*

8    808 Fed. App'x 509 (9th Cir. 2020) ...................... 19-20

9  *United States v. Bishop*,

10   66 F.3d 569 (3d Cir. 1995) .................................. 17

11  *United States v. Buculei*,

12   262 F.3d 322 (4th Cir. 2001) ................................. 2

13  *United States v. D'Souza,*

14   2012 WL 487638 (E.D. Cal. Feb. 7, 2012) .................... 16

15  *United States v. Frank*,

16   599 F.3d 1221 (11th Cir. 2010) .............................. 21

17  *United States v. Horne*,

18   474 F.3d 1004 (7th Cir. 2007) ............................... 16

19  *United States v. LaBrecque*,

20   433 Fed App'x 551 (9th Cir. 2011) ..................... 3, 4, 13

21  *United States v. Laursen*,

22   847 F.3d 1026 (9th Cir. 2017) ............................... 22

23  *United States v. Rosenow*,

24   33 F.4th 529 (9th Cir. 2022) ................................. 5

25  *United States v. Small*,

26   988 F.3d 241 (6th Cir. 2021) ................................ 17

27  Statutes

28  18 U.S.C. § 247 ................................................ 15

i

18 U.S.C. § 2251A ........................................... *passim*

18 U.S.C. § 2251 ................................................. 5

18 U.S.C. § 2256 .............................................. 2, 3

Miscellaneous

Corbin on Contracts § 2.14 (2022) ............................. 18

Corbin on Contracts § 2.16 (2022) ............................. 18

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   THE UNITED STATES PROVED BEYOND A REASONABLE DOUBT THAT DEFENDANT WAS GUILTY OF COUNTS ONE THROUGH NINE OF THE FIRST SUPERSEDING INDICTMENT**

The evidence presented at trial demonstrated that defendant Stefani Stevens ("defendant") (i) obtained custody of Victim A, a five-month-old infant, on May 22, 2019, to create videos of herself performing oral sex on, and penetrating, Victim A, and to share those videos on Mega.nz, an internet-based database and communications platform (Counts One and Six); (ii) produced four close-up child pornography images of herself spreading and penetrating Victim A's vagina on June 22, 2019 (Count Seven); and (iii) distributed two of those four child pornography images of Victim A to another user on Mega six days later on June 28, 2019 (Count Eight).  The evidence also showed that defendant produced child pornography images of Victim N, a six-year-old, including close-up photographs of defendant spreading Victim N's vagina, on or about October 31, 2019 (Count Two), November 4, 2019 (Count Three), November 12, 2019 (Count Four), and November 13, 2019 (Count Five).  All of these videos and images of Victim A and Victim N were possessed in defendant's online Mega account, along with more than 1,700 other child pornography videos and images (Count Nine).

For the reasons discussed below, the Court should find that the United States proved beyond a reasonable doubt that defendant was guilty of Counts One through Nine of the First Superseding Indictment.

1  **II.   COUNT ONE:   DEFENDANT OBTAINED CUSTODY AND CONTROL OF VICTIM A**

2  **WITH THE INTENT TO PRODUCE CHILD PORNOGRAPHY**

3         Defendant obtained custody and control of Victim A on May 22,

4  2019, with (i) knowledge that, as a result of taking custody, Victim

5  A would be portrayed in child pornographic videos of defendant

6  licking and penetrating Victim A, and (ii) the intent to create child

7  pornographic videos of Victim A, in which defendant would lick and

8  penetrate Victim A.  Because the evidence proved each of Section

9  2251A(b)'s four elements discussed below beyond a reasonable doubt,

10 the Court should find defendant guilty of Count One.

11        **Element One:  Defendant obtained custody or control of Victim A**

12 **on May 22, 2019.**  Under 18 U.S.C. § 2256(7), "custody or control" is

13 defined to include "temporary supervision over or responsibility for

14 a minor whether legally or illegally obtained."  It does not require

15 the same degree of control over the minor as that exercised by a

16 parent or a guardian.  *See United States v. Buculei*, 262 F.3d 322,

17 331-32 (4th Cir. 2001).  Here, Victim A's Mother testified that on

18 May 22, 2019, defendant babysat Victim A while Victim A's Mother was

19 at work.  (Ex. 2.)[1]  During that time, defendant was responsible for

20 Victim A's well-being.  For example, defendant was responsible for

21 feeding Victim A, putting Victim A down for her naps, and changing

22 Victim A's diapers.  (*Id.*)  Thus, this element is met.

23        **Element Two:  Victim A was a minor on May 22, 2019.**  A "minor"

24 means any person under the age of 18 years old.  *See* 18 U.S.C.

25

26 _____

27        [1] Because the United States has not received a copy of the trial
   transcript before filing its initial closing brief, it did not
   include citations to the trial transcript in its brief.  Citations to

28 "Ex. __" however, are to the United States' exhibits admitted at
   trial.

2

§ 2256(1).  Victim A's Mother testified to Victim A's date of birth, confirming Victim A was less than six months old at the time defendant created the child pornography videos of herself licking and penetrating Victim A.

**Element Three:  Defendant had the requisite state of mind required under Section 2251A(b).**  There are two alternate ways to satisfy the third element.  Although proving either satisfies Section 2251A(b), the United States proved both beyond a reasonable doubt.

*Alternate One:  Knowledge (Section 2251A(b)(1)).*  The United States can satisfy the third element of Section 2251A(b) by showing that defendant obtained custody or control of Victim A with knowledge that, as a consequence of obtaining custody, Victim A would be portrayed in a visual depiction engaging in sexually explicit conduct.  The Ninth Circuit's decision in *United States v. LaBrecque*, 433 Fed App'x 551 (9th Cir. 2011), is informative on the meaning of this provision.

In *LaBrecque*, co-defendant Michael LaBrecque ("Michael") was charged with obtaining custody and control of J. Harrod, the son of co-defendant Irene Harrod ("Irene"), with knowledge that, as a consequence of obtaining custody, J. Harrod would be portrayed in sexually explicit photographs.  (*Id.*)  Specifically, in 1991, Irene flew J. Harrod from her home in California to Michael's home in Texas, where Irene ordered J. Harrod and Michael's wife, co-defendant Juliette LaBrecque ("Juliette"), to go into a bedroom and assume sexually explicit poses together while Irene took photos of J. Harrod and Juliette.  (*Id.*)  The Ninth Circuit found that there was insufficient evidence that sexually explicit photographs of J. Harrod were knowingly produced "as a consequence" of Michael obtaining

3

1   custody or control of J. Harrod because there was no evidence that

2   Irene ever spoke to Michael about the photos before they were taken,

3   or that Michael otherwise exercised any control over J. Harrod with

4   regard to the photo shoot.  *LaBrecque*, 433 Fed. App'x at 551.  The

5   fact that J. Harrod was staying in Michael's home alone was

6   insufficient to satisfy the "as a consequence" requirement because

7   his mother Irene was also present and his mother Irene retained

8   custody and control of J. Harrod during that time.  *Id.*  In other

9   words, as the Ninth Circuit explained, the sexually explicit photos

10  were taken as a consequence of J. Harrod's mother having control over

11  him, not as a consequence of Michael exercising any control over J.

12  Harrod.  *Id.*

13       In a concurring opinion, a Circuit Judge agreed with the

14  majority's result but disagreed with its reasoning.  *Id.* at 555 (Bea,

15  C.J., concurring).  The Circuit Judge explained that "consequence"

16  means "that which follows from any act, cause, principle, or series

17  of actions; an event or effect produced by some preceding act or

18  cause; a result," and there was sufficient evidence in the record

19  that Michael knew that the photo shoot was intended as a consequence

20  of Irene taking her son to stay with Michael in Texas.  (*Id.* at 555-

21  56.)  But the Circuit Judge reasoned that the Michael did not have

22  "custody or control" over J. Harrod because his mother Irene was

23  present in the house at all relevant times.  (*Id.*)

24       Together, a reading of the majority and concurring opinion

25  demonstrates that *Labrecque* stands for the proposition that the state

26  of mind required under Section 2251A(b)(1) is satisfied where the

27  defendant had custody of the minor and was aware that the minor would

28  be portrayed in sexually explicit images as a result of the defendant

4

1    obtaining custody of the minor.  The evidence adduced at trial, shows

2    that defendant was aware that Victim A would be portrayed in sexually

3    explicit videos as a result of defendant obtaining custody of Victim

4    A.

5        *Alternate Two:  Intent (Section 2251A(b)(2)(A)).*  The third

6    element can also be satisfied where the United States proves that

7    defendant obtained custody or control of Victim A with the intent to

8    promote the engaging in of sexually explicit conduct by Victim A for

9    the purpose of producing a visual depiction of the conduct.  The

10   Court ruled on October 20, 2021, that the United States must prove

11   defendant acted with a "dominant, significant, or motivating" intent.

12   Similarly, to prove defendant acted "for the purpose of" producing a

13   visual depiction of a minor engaged in sexually explicit conduct, the

14   Ninth Circuit held in *United States v. Rosenow*, in the context of 18

15   U.S.C. §§ 2251(c) and (e), attempted sexual exploitation of a child –

16   – which uses the same language as Section 2251A(b) -- that the United

17   States must prove that defendant's purpose was dominant, significant,

18   or motivating.  33 F.4th 529, 549 (9th Cir. 2022).  However, under

19   *Rosenow*, and the Court's ruling in this case, the United States does

20   not need to prove that producing a visual depiction of a minor

21   engaged in sexually explicit conduct was the sole purpose for

22   defendant's conduct.  (*Id.*)  Here, the evidence clearly shows that a

23   dominant, significant and motivating intent for defendant to obtain

24   custody of Victim A was so that she could produce a visual depiction

25   of Victim A engaged in sexually explicit conduct.

26       *The evidence shows defendant had both the knowledge and intent*

27   *required under Section 2251A(b).*  Defendant's sexual interest in

28   children began no later than the end of 2017 or early 2018.  As

5

defendant admitted during her November 8, 2019 interview, defendant began communicating with like-minded users online about child pornography approximately two years earlier (i.e., November 2017). (Ex. 12.)  Knowing it was wrong, defendant took steps to hide her sexual interest in children.  By way of example, she created a new email address at oneandonly7210@gmail.com in April 2018.  (Ex. 70.) She then changed her email address for her onenonly7210 Kik account from stevens.stefani515@gmail.com to oneandonly7210@gmail.com and began using that to communicate about child pornography.  (Ex. 12.) And shortly after that, defendant created a Mega.nz account to store the hundreds of child pornography images and videos she viewed and communicated about via Kik, Google, and other internet-based platforms.  (Exs. 74-75.)

Viewing, communicating about, and saving child pornography was just the start.  By July 13, 2018, as defendant's online chats show, defendant began producing her own child pornography images of Victim N.  In a chat with greenponddb42@gmail.com that day, defendant sent naked photographs of Victim N and stated, "Baby I got to play with my 8 y[r] old niece today," "she let me touch her and it was so amazing !!," and "[s]he did let me [p]ut my finger in her as well but I was [i]n the moment I forgot to take a picture and she giggles the whole time it's the first t[i]me she has ever been touched."  (Ex. 5 at 64-66.)  That was an eye-opening day.  Defendant finally found herself. As she explained to greenponddb42@gmail.com in subsequent messages, "I just love I can share these things with you and [i] couldn't wait and tell you.  You['re] the only person who fee[ls] the way i do and i can share these things with [you] it's just an amazing feeling." (*Id.* at 64.)

1     By August 2018, defendant was also expressing a desire to meet

2 someone so that he could get defendant pregnant and give her a baby

3 to play with.  For example, on August 7, 2018, after telling

4 hankmeiser1983@gmail.com about her "fantasy" to "mess[] with young,"

5 hankmeiser1983@gmail.com asks defendant if she "[w]ould like [him] to

6 fuck more babies in [her]," to which defendant responded:  "Hell yes

7 so bad[.]  I want to play with ou[r] new born so bad."  (Ex. 9 at 1,

8 3.)

9     During this time that defendant was fantasizing about playing

10 with babies, defendant was still acting out her sexual desires with

11 Victim N too.  A combination of metadata (e.g., date taken, device

12 used, GPS location), file properties data (e.g., file name, media

13 created), and defendant's admissions, establish that defendant

14 created at least 29 child pornography or erotica photographs of

15 Victim N between July 13, 2018 and November 13, 2018.  (Exs. 5 at 64-

16 66, 12, 92 at 3-5.)  It was, thus, only a matter of time before

17 defendant would find a baby to also use to fulfil her fantasies.

18     As the months went on, defendant continued pursuing her desire

19 to play with newborns.  In the spring 2019, defendant was viewing

20 infant sexual abuse material online.  In fact, defendant's three Kik

21 accounts were shut down in April and May of 2019 because defendant

22 uploaded the three infant exploitation images described below to

23 Kik's platform:

| Kik Account | Date Uploaded | Description of Image |
|---|---|---|
| Onenonly7210 | April 13, 2019 | The image depicts a nude male adult vaginally penetrating an **infant** female with his penis.  The **infant** is lying on her back.  The **infant** is wearing "onesie" pajamas that have been partially removed, resulting in her being nude from stomach |

7

| | | |
|---|---|---|
| | | down to her feet.  The camera is closely focused on the **infant's** abdomen and pelvic area as a male adult's erect penis is penetrating the **infant.**  (Ex. 17-003.) |
| Lover7210 | May 8, 2019 | The image depicts an **infant** laying on its back.  The **infant** is wearing a onesie that has been unzipped exposing the **infant's** bare chest.  A male adult's erect penis is exposed and is resting on the lips of the **infant.**  The image is closely focused on the male adult's penis and the **infant's** face and abdomen.  (Ex. 17-001.) |
| KaseyJ187 | May 21, 2019 | The image depicts an **infant** laying on their stomach on top of bedding that is grey in color with roses and flowers printed on it.  The **infant** appears to be nude.  A white adult person's hand is seen spreading open the buttocks of the **infant** exposing the **infant's** anus and vagina to the camera. The camera is closely focused on the **infant's** buttocks and vagina area. (Ex. 17-005.) |

But defendant was not only collecting and viewing infant sexual abuse material.  She was chatting about her desire to engage in sexual acts with infants in the spring of 2019.  For example, on April 7, 2019, defendant asked max6lover9@gmail.com if he would "[g]et [her] pregnant [to] give [her] babies to play with" because she "want[s] to lick baby pussy."  (Ex. 6 at 1; *see also* Ex. 7 at 3 (on May 11, 2019, defendant telling ea79jr@gmail.com how she "lick[s] and finger[s]" Victim N "[e]very night before bed.")

So, when defendant overheard Victim A's Mother talking about her interest in returning to work if she could find appropriate child care around the same time, defendant seized the moment.  As Victim A's Mother testified, in or around April 2019, defendant offered to watch Victim A if Victim A's Mother wanted to go back to work.  And on April 28, 2019, Victim A's Mother followed up with defendant by iMessage to discuss the offer:  "If I got a job would you wanna watch

1   the kids?  We'd pay you obviously."  (Ex. 95 at 1.)  In response,

2   defendant stated she would "love" to watch Victim A.  (*Id.*)

3       Shortly thereafter, Victim A's Mother testified that she found a

4   job and her first day of work was May 22, 2019, meaning defendant

5   would finally get to "babysit" Victim A.  The day before defendant's

6   first day babysitting while Victim A's Mother was working, May 21,

7   2019, defendant could not hold back her excitement.  While hiding her

8   intent to sexually abuse Victim A from Victim A's Mother, defendant

9   informed user Tommy Pape Pape on Mega about the true reasons for her

10  excitement:

| ~Time on May 21 | Tommy Pape Pape Chat (Ex. 4) | Victim A's Mother Chat (Ex. 2) |
|---|---|---|
| 1:27 p.m. | **Def:**  I can't stop watching the first video !!  **It's getting me excited for watching my niece tomorrow I am going to lick her and can't wait to share it with you** | |
| 2:09 p.m. | | **A's Mother:**  So what all do you want me to bring tomorrow for the kids? |
| 2:11 p.m. | | **Def:**  Just the usual stuff I have snacks and stuff for Eli. |
| 2:13 p.m. | | **A's Mother:**  Ok do you want [Victim A's] chair? |
| 2:17 p.m. | | **Def:**  Yes please. |
| 2:25 p.m. | | **A's Mother:**  Ok and I'll probably just go get you a tub of formula for you to keep at your house . . . . |
| 2:53 p.m. | | **A's Mother:**  Do you [h]ave somewhere for [Victim A] to sleep? |

9

| | | |
|---|---|---|
| 2:59 p.m. | | **Def:** I can put her in the middle of my bed with pillows around her u less you don' want that you can bring her play pen |
| 3:34 p.m. | **Def:** It's my brothers kid o can't wait to lick [Victim A] so good mm yes I am so excited!! Mmm yes baby i loved that video !! Fuck you [know] how to turn me on **just wait till tomorrow i will have a nice video of me licking a 5 month old and licking [Victim A's] ass and pussy** god I can't wait | |
| 4:04 p.m. | **Def:** [video of Victim A] That's my niece who i will lick tomorrow | |
| 4:27 p.m. | **Def:** i know **i can't wait to lick her tomorrow** i'll be imagining it's ours | |
| 4:28 p.m. | **TPP:** I can't wait to see u with her | |
| 4:28 p.m. | **Def:** Yeah I'll video it all | |

That morning, defendant waited in anticipation. At **7:52 a.m.,** defendant told Tommy Pape Pape that she was "waiting on [her] niece to be here she will be here at 12 [p.m.]" (Ex. 4.) Minutes later, at **8:06 a.m.,** defendant told Tommy Pape that she would call him "daddy" in her video licking Victim A and reiterated how excited she was about it: "Gosh i am excited can't wait till she's here." (*Id.*)

About 45 minutes later, at **8:49 a.m.,** Victim A's Mother iMessaged defendant that Victim A was taking a nap and she would head

10

over after Victim A wakes up.  (Ex. 2.)  Then, at **10:01 a.m.,** after Victim A's Mother drove Victim A, as well as a tub of formula and a chair for Victim A, in a car on the Interstate 10 highway and exited the off ramp, Victim A's Mother iMessaged defendant that she would be arriving at defendant's home shortly after she got gas in Calimesa. (*Id.*)

By **12:19 p.m.,** defendant let Tommy Pape Pape know that she had sole custody of Victim A by sending him a video of herself naked and Victim A fully clothed sitting on her bed in the master bedroom of her home.  Defendant wasted no time.  During the next about 10 minutes, defendant created a series of at least four infant sexual abuse videos between herself and Victim A on her iPhone and shared three of them with Tommy Pape Pape.

| Ex. | Description of Child Pornography Video of Victim A |
|---|---|
| 51 | In the first video, Victim A is wearing a diaper, size two, with a small blue vertical line on the pelvic area indicating that Victim A urinated in Victim A's diaper. Defendant then removes the front part of the diaper exposing Victim A's genitalia to the camera.  Defendant then spreads Victim A's legs apart exposing Victim A's vagina to the camera.  Defendant then begins touching Victim A's vagina and partially penetrates Victim A's vagina at times. |
| 50 | Second, after removing Victim A's diaper and exposing Victim A's vagina to the camera, defendant uses her index finger to rub up and down Victim A's exposed vagina.  Defendant can be heard talking to Victim A during the video.  Towards the end of the video, defendant uses two fingers to spread open Victim A's vagina. |
| 49 | Third, defendant takes a close up video of herself performing oral sex on Victim A.  During the video, defendant is heard saying to the camera, as asked by Tommy Pape Pape, "You like this daddy?" |
| 52 | Finally, defendant creates a second close up video of herself performing oral sex on Victim A.  During this video, defendant is heard making noises while licking Victim A's vagina. |

There is more.  In addition to the months-long desire defendant had to create child pornography videos of herself licking a baby that culminated in the videos created on May 22, 2019, there is other evidence of defendant's knowledge and intent.  First, it was often defendant who went out looking for other users to communicate with about child pornography.  For example, on April 7, 2019, after max6lover9@gmail.com tells defendant that he does not like babies and prefers "only 18+," defendant responds, "okay then mayb[e] your not for me."  (Ex. 6 at 1.)  By way of additional example, on May 11, 2019, after speaking with ea79jr@gmail.com about "poo and pee" porn, defendant asks if ea79jr@gmail.com likes "young or incest."  (Ex. 7 at 4; *see also* Ex. 10 at 80 (defendant shifts conversation to child pornography, "How do you feel [a]bout young?").)

Second, the size, organization, and folder names of defendant's Mega account are additional evidence of defendant's intent and knowledge.  From October 25, 2018 -- when defendant setup her Mega account -- to November 8, 2019 -- the date defendant was arrested -- defendant accumulated 13.78 gigabytes of content in her account, which included more than 1,700 suspected child pornography videos and images.  (Ex. 92 at 7.)  Additionally, her Mega account was neatly organized, such as an entire folder called "love" dedicated to child pornography of Victim A, an entire folder called "daughter [Victim N's Mother]" dedicated to child pornography of Victim N, among many other folders like "favorites," "best," and "new love," which all contained child pornography.

And finally, defendant's knowledge and intent is evident from her attempts to hide her use of her online accounts and her online search activity.  Between October 2018 and November 2019, defendant

1   repeatedly downloaded, deleted, and then re-downloaded mobile
2   applications like Mega and Kik on her iPhone so that she could hide
3   her use of those applications.  (Ex. 78.)  Defendant also performed
4   Google searches for "best child porn pron [sic] with no government
5   motering [sic]," "free real taboo brother cum in sister," and "free
6   real dad daughter porn."  (Ex. 73 at 178, 212, 222.)

7        Collectively, this evidence proves beyond any reasonable doubt
8   that defendant obtained custody and control of Victim A on May 22,
9   2019 with both (1) knowledge that, as a result of taking custody of
10  Victim A, Victim A would be portrayed in videos of defendant licking
11  and penetrating Victim A that she would share with Tommy Pape Pape
12  online; and (2) the motivating, significant, or dominant intent to
13  promote Victim A engaging in sexually explicit conduct in videos that
14  would be sent to Tommy Pape Pape.

15       Unlike in *LaBrecque*, here there is significant evidence of
16  defendant's knowledge.  As discussed above, the Ninth Circuit
17  reversed Michael's conviction under Section 2251A(b) in *LaBrecque*
18  because it reasoned that the United States did not present sufficient
19  evidence that Michael knew the photo shoot involving J. Harrod was
20  taking place and because J. Harrod's mother remained in control of J.
21  Harrod during the photo shoot.  433 Fed App'x at 551-56.  In
22  contrast, here, the United States has presented overwhelming evidence
23  showing that defendant knew the May 22, 2019 child pornography videos
24  of Victim A were being taken (she admitted to taking them and her
25  face is seen in the videos) and that defendant had sole custody of
26  Victim A at the time the child pornography videos of Victim A were
27  taken (Victim A's Mother testified that defendant was babysitting
28  Victim A at the time).

1        Likewise, the intent prong is met here because defendant's

2    repeated statements on May 21, 2019 about how she was "so excited"

3    for her first day babysitting Victim A so that she could create

4    videos of herself licking Victim A establishes that, at a minimum,

5    defendant's intent to do so was motivating.  And when all the

6    evidence discussed above is viewed as a whole, it further establishes

7    that defendant's intent was not only a motivating one, but a

8    significant and dominant one, if not the sole reason for her offer to

9    "babysit."  Put another way, the real reason defendant offered to

10   babysit Victim A in or around April 2019 was because defendant wanted

11   to get unfettered access to Victim A to act out her sexual desires on

12   Victim A.  Defendant never cared about the baby's well-being -- her

13   intent from the get-go was to act out her sexual fantasy to have her

14   own baby to play with.  Her online chats that discuss creating a

15   family that engages in an incestual sexual relationship corroborate

16   this.  (Exs. 6-10.)  Consider, for instance, how defendant told

17   greenponddb42@gmail.com in July 2018 how she "had a nice dream about

18   [them] last night" involving defendant giving "birth to a beautiful

19   baby girl and from the second [the baby] came out you took her and

20   licked her right away."  (Ex. 5 at 96.)  Or how defendant asked user

21   max6lover9@gmail.com in April 2019 to "get [her] pregnant [to] give

22   [her] babies to play with" so that she could "lick baby pussy."  (Ex.

23   6 at 1-2; *see also* Ex. 10 at 13 (in November 2019, asking

24   nutellaaos72@gmail.com, "[w]ill [he] get [her] pregnant" because

25   "[defendant] want[s] babies to play with").)

26       In conclusion, the evidence clearly demonstrates that defendant

27   had the required state of mind to violate Section 2251A(b).

28

1    **Element Four:  The United States proved two alternate**

2    **jurisdictional circumstances.**  Section 2251A(b)(1) provides that

3    "[w]hoever purchases or otherwise obtains custody or control of a

4    minor" with either the requisite knowledge or intent is guilty of the

5    offense "if any of the circumstances described in subsection (c) of

6    this section exist."  Here, the United States has proven two

7    jurisdictional circumstances:  subsections (c)(1) and (c)(2).

8    *First*, subsection 2251A(c)(1) states, "in the course of the

9    conduct described in such subsections [(a) or (b)] the minor or the

10   actor traveled in or was transported in or affecting interstate or

11   foreign commerce."  Here, Victim A's Mother testified that, in the

12   course of defendant obtaining custody or control of Victim A on May

13   22, 2019, Victim A's Mother drove Victim A on Interstate 10.

14   According to Victim A's Mother, she "always" took Interstate 10 when

15   driving to defendant's home because defendant lived near the

16   interstate highway and that included on May 22, 2019.  This satisfies

17   subsection 2251A(c)(1) for two independent reasons:  Victim A

18   traveled on an interstate highway and in a car.

19   *United States v. Ballinger* discusses why.  There, the defendant

20   challenged the jurisdictional circumstance that was used to prove his

21   conviction for destruction of religious property, in violation of 18

22   U.S.C. § 247, which contains, similar to here, "in or affects

23   interstate or foreign commerce" language.  395 F.3d 1218, 1224 (11th

24   Cir. 2005).  But the Eleventh Circuit found the jurisdictional

25   circumstance satisfied in the case, in part, because defendant

26   traveled "in a van (an instrumentality of commerce) along interstate

27   highways (a channel of commerce)."  *Id.* at 1228.  Relying on Supreme

28   Court precedent, the *Ballinger* court explained there are three main

15

categories of congressional commerce power:  (1) channels, (2) instrumentalities, and (3) intrastate conduct that substantially affects commerce.  *Id.* (citing *United States v. Lopez*, 514 U.S. 549 (1995)).  It further explained that the "in commerce" language denotes the first two categories -- regulation of channels and of the instrumentalities of commerce -- and the "affecting commerce" language relates to the third category -- regulation of intrastate activities that substantially affects commerce.  With that background, the *Ballinger* court reasoned that "channels include highways" because "they are routes for the interstate transportation of people and goods" and "instrumentalities of interstate commerce . . . are the people and things themselves moving in commerce, including *automobiles*, airplanes, boats, and shipment of goods."  *Id.* at 1226 (emphasis added.)

For these reasons, district and circuit courts around the country find that either traveling on an interstate highway or driving in a car satisfy similar jurisdictional requirements.  *See United States v. D'Souza*, No. 2:09-CR-00131-MCE, 2012 WL 487638, at *2 (E.D. Cal. Feb. 7, 2012), *aff'd*, 531 F. App'x 827 (9th Cir. 2013) ("Defendant admitted that he used *other* facilities in interstate commerce (*e.g.*, interstate highways).") (emphasis in original); *United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007) (holding that the interstate commerce element of the Hobbs Act was satisfied by a defendant's use of an internet auction website to lure his victims to him, and "the government thus had no need to argue that the . . . victims . . . traveled from other states, and that they carried their money across state lines," because "the online auction site . . . is an avenue of interstate commerce, like an interstate

16

1  highway or long-distance telephone service"); *Griffith v. United*
2  *States*, No. 03 Civ. 7860, 2005 WL 245071, at *3 (S.D.N.Y. Oct. 6,
3  2005) (rejecting argument that interstate nexus had not been met in
4  Mann Act prostitution case where "the evidence [was] more than
5  sufficient to support a finding by the jury that the defendants, by
6  virtue of their travel on *interstate highways*, took full advantage of
7  the channels of interstate commerce to further their unsavory
8  business endeavors") (emphasis added); *United States v. Thomas*, 553 F
9  Fed. App'x 941, 946 (11th Cir. 2014) ("For purposes of the murder-
10 for-hire statute, facilities of interstate commerce include cellular
11 phones and automobiles."); *United States v. Small*, 988 F.3d 241, 251
12 (6th Cir. 2021) (use of a rental car to cross state lines satisfied
13 the interstate commerce element of the federal kidnapping statute, 18
14 U.S.C. § 1201(a)); *United States v. Bishop*, 66 F.3d 569, 588 (3d Cir.
15 1995) ("[M]otor vehicles are the quintessential instrumentalities of
16 modern interstate commerce.") (internal quotation marks omitted).

17     *Second*, subsection 2251A(c)(2) states, "any offer described in
18 such subsections was communicated or transported using any means or
19 facility of interstate or foreign commerce or in or affecting
20 interstate or foreign commerce by any means including by computer or
21 mail."  This expansive jurisdictional circumstance is likewise met.

22     Victim A's Mother testified that she used an iPhone to
23 communicate with defendant in April and May of 2019 about defendant's
24 offer to babysit Victim A so that she could return to work.
25 Specifically, Victim A's Mother testified that in April 2019, after
26 overhearing Victim A's Mother speaking about her desire to return to
27 work subject to finding suitable child care, defendant made an oral,
28 in-person offer to babysit Victim A.  Then, on April 28, 2019, Victim

A's Mother iMessaged defendant to discuss the offer.  In an
11:54 a.m. message that morning, Victim A's Mother reached out to
defendant about her offer:  "If I got a job would you wanna watch the
kids?  We'd pay you obviously."  (Ex. 95 at 1.)  The two then
proceeded to negotiate the terms of the offer, discussing, for
example, how defendant would watch Victim A at defendant's house for
$150 a week.  (*Id.* at 1-2.)  The April 28, 2019 iMessages ended with
defendant renewing her offer and Victim A's Mother conditionally
accepting the offer if she found a job, which she eventually did and
started on May 22, 2019.  (*Id.* at 3; Ex. 2.)

Victim A's Mother's testimony is consistent with the evidence
because it would not make sense that Victim A's mother would message
defendant to ask her to babysit Victim A unless Victim A's Mother
knew that defendant had previously offered to do so.  Additionally,
given that Victim A's Mother testified that she was frequently around
defendant in the spring of 2019 because defendant was dating her
relative, it makes sense that defendant would have been in a position
to overhear Victim A's Mother discussing her desire to return to
work.  And building on that, given the sexual desire to play with
babies brewing inside of defendant around that time, it further makes
sense that defendant would have offered to "babysit" Victim A after
overhearing Victim A's Mother mention that she would go back to work
if she could find child care for Victim A.

This reading is also consistent with contract law.  Defendant's
initial, in-person offer created a power of acceptance in Victim A's
Mother and remained open for a reasonable time given that it did not
specify an expiration date.  Corbin on Contracts §§ 2.14, 2.16
(2022).  So, Victim A's Mother still had the power to accept the

1    offer by time of the April 28, 2019 iMessages, and especially so,

2    after defendant renewed the offer that day.

3        Accordingly, here, offers relating to Victim A occurred during

4    the commission of the crime and was communicated or transported using

5    any means or facility of interstate or foreign commerce or in or

6    affecting interstate or foreign commerce by any means.

7        *United States v. Clemans*, 808 Fed. App'x 509 (9th Cir. 2020),

8    provides guidance on this issue.  In *Clemans*, the defendant was

9    charged with offering to obtain custody and control of minors under

10   Section 2251A(b) based upon electronic communications defendant had

11   with people abroad to make offers to parents to recruit their

12   children for child pornography.  *Id.* at 510.  Defendant challenged

13   his conviction on the ground that he did not make any direct "offers"

14   to the children's parents and, moreover, the offers that were made to

15   obtain custody and control of the victims "were all made in person,

16   orally, by" people abroad to the guardians of the victims.  *United*

17   *States v. Clemans*, No. 18-10035, Dkt. No. 16, at 40-41 (Opening Brief

18   of Appellant).  But the Ninth Circuit rejected this claim.  It

19   reasoned that "[e]ven though [defendant] did not speak directly with

20   the parents, nothing in the statute suggests that a defendant must

21   communicate directly with the parents to constitute an 'offer.'"  *Id.*

22   (citing 18 U.S.C. § 2251A).  The *Clemans* court continued:  "the

23   statute neither specifies to whom the offer must be made nor suggests

24   that a defendant can escape criminal liability by making the offer to

25   an intermediary, rather than to the parent directly."  *Id.*  So, "even

26   though [defendant] conveyed his offers to [a person abroad], and

27   instructed her to convey those offers to parents, that conduct was

28   sufficient."  *Id.*  Thus, *Clemans* establishes that offers may be in

                                    19

person and do not even need to be made by the defendant, so long as during the course of the offense, the offer is at some point communicated or transported using a means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce.

Applying *Clemans* to this case answers two issues before the Court.  First, like in *Clemans*, the offer to the parent can be oral.  And second, similar to how *Clemans* recognized that Section 2251A's use of "offer" does not specify "*to whom* the offer must be made," Section 2251A(c)(2)'s use of offer also does not specify *by whom* the offer must be made.  Rather, Section 2251A(c)(2) states that "*any* offer*" made will suffice.  So, *Clemans* confirms that (i) defendant's initial in-person, oral offer to Victim A's Mother satisfies subsection (c)(2), but also (ii) even if the Court somehow concluded that Victim A's Mother's April 28, 2019 iMessage -- "If I got a job would you wanna watch the kids?  We'd pay you obviously." (Ex. 95) -- was the initial offer instead of a follow-up on defendant's earlier offer, it would not change the outcome since "any" offer can satisfy subsection (c)(2).  Proving defendant was the one who made the offer is only necessary in cases where the defendant is charged with the crime "offering to obtain" custody or control of a minor under Section 2251A(b) (like in *Clemans*); but here, defendant is charged with "obtaining custody or control" of a minor under Section 2251A(b) and so, for jurisdictional purposes under Section 2251A(c), the offer can be from anyone involved in the crime.[2]

---

[2] This is yet another reason why the position taken by defendant in her Trial Memorandum (ECF No. 67) -- that Section 2251A(c)(2)'s jurisdictional circumstance is limited to cases where the defendant
*(footnote cont'd on next page)*

1    This is also consistent with Congress's intent to make Section

2    2251A's jurisdictional circumstances be as far reaching as possible.

3    *See United States v. Frank*, 599 F.3d 1221, 1231 (11th Cir. 2010)

4    ("Section 2251A is part of a comprehensive scheme created by Congress

5    to eradicate the sexual exploitation of children and eliminate child

6    pornography, and therefore warrants a broad sweep."). As the

7    legislative history materials confirm, the offer was intended to

8    cover "*any* offer" relating to the child that was made during the

9    commission of the offense. 18 U.S.C. § 2251A(c)(2) (emphasis added);

10   ECF No. 72, at 30 (Congressional Record stating that Section

11   2251A(c)(2) covers "any offer described in the offense"); ECF No. 72,

12   at 49 (Congressional Quarterly stating that Section 2251A(b) covers

13   instances "when any offer relating to the child was communicated").

14   Finally, interpreting the jurisdictional provision narrowly

15   would lead to absurd results. For example, a defendant could escape

16   liability for violating Section 2251A(b) by making oral offers to

17   parents to take custody of their children to create child pornography

18   videos, even where those offers lead to events that involve

19   communications that are made using a means or facility of interstate

20   commerce or are otherwise in or affecting interstate commerce. For

21   instance, a person who made an oral offer to a parent but

22   subsequently engaged in the planning of events to take custody of the

23   child on an iPhone would be immune from prosecution. Or even worse,

24

25   is charged with "offering to obtain custody or control" -- is
     incorrect. (ECF No. 72 at 7-9.) Congress envisioned cases like this

26   one where a defendant would suggest the parent was the one who made
     the offer that resulted in the defendant obtaining custody of the

27   minor and did not want a defendant to avoid prosecution on that
     basis. If Congress intended for that perverse result to occur, it

28   would have written "defendant's offer" instead of "any offer" in
     Section 2251(c)(2) like it specified in Section 2251A(b).

21

a person could use contractual law to make themselves immune from prosecution by engaging in only preliminary negotiations with a parent, stopping short of making an offer, and then soliciting the formal offer from the parent.  These type of outcomes could not be what Congress intended.

## III. COUNTS TWO THROUGH SEVEN:  DEFENDANT PRODUCED CHILD PORNOGRAPHY OF VICTIM A AND VICTIM N

As detailed above, defendant is also guilty of producing child pornography videos and images of Victim N and Victim A.

On or about October 31 (Ex. 27), November 4 (Exs. 28-29), November 12 (Exs. 31-41), and November 13 (Exs. 42-48), 2019, defendant used, employed, persuaded and induced Victim N to appear in child pornography photographs of Victim N, including nude photographs of Victim N lying on her back in her bed and positioning her legs up in the air so that her genitalia and anus were the foci of the photos.  *See United States v. Laursen*, 847 F.3d 1026, 1032 (9th Cir. 2017) (used means "to put into action or service, to avail oneself of, or to employ.")  To get Victim N to take these photos, defendant taught Victim N that "every time [defendant] says like 'spread,' [she]'ll know what to do."  (Ex. 103.)  Defendant would tell Victim N to "hold [her] legs" up and defendant would even "move[] [Victim N's] leg's around."  (*Id.*)  Defendant persuaded and induced Victim N to take these photographs by claiming their purpose was to show to a doctor because Victim N purportedly had rashes or red bumps on her body.  (Ex. 14; 103.)  Additionally, not only did Victim N confirm multiple times that defendant was the one who took these photos in a December 18, 2019 interview (Ex. 103 ("No one, no one, takes this

22

picture except Stefani!")), but, in a November 8, 2019 interview, defendant admitted to taking them about one year earlier.  (Ex. 13.)

Similarly, and as discussed above, on May 22, 2019, defendant used or employed Victim A to produce child pornography videos of Victim A (Exs. 49-55) and, and again, on June 22, 2019, defendant used or employed Victim A to create four child pornography images of herself spreading Victim A's vagina (Exs. 56-59).

Finally, the United States also proved all of the jurisdictional circumstances, though it only needs to prove one of the four:

| Must Prove Only One of Four | All Four Were Proven |
| --- | --- |
| Defendant knew or had reason to know visual depiction would be mailed or transported across state lines or in foreign commerce; | Defendant admitted that she took the photographs and videos because other like-minded users asked her to send them to them online (Ex. 12); |
| Visual depiction was produced using materials that had been mailed, shipped, or transported across states lines or in foreign commerce; | iPhone X and iPhone XS Max were manufactured in China and shipped to the United States (Ex. 76); |
| Visual depiction was mailed or actually transported across states lines or in foreign commerce; **OR** | Photographs and videos were loaded from defendant's iPhones in California onto New Zealand-based Mega.nz over the internet (Ex. 3); and |
| Visual depiction affected interstate commerce. | All of the above. |

**IV.   COUNT EIGHT:  DEFENDANT DISTRIBUTED TWO CHILD PORNOGRAPHY IMAGES OF VICTIM A ON JUNE 28, 2019**

The United States further proved beyond a reasonable doubt that defendant distributed two child pornography images of Victim A on June 28, 2019.  (Exs. 58-59.)  Specifically, defendant sent images titled "2019-06-22 18.20.26" and "2019-06-22 18.20.31" -- which were two of the four images created six days earlier on June 22, 2019 -- to Tommy Pape Pape on her Mega.nz account.  (Ex. 4.)  These images

depicted Victim A engaged in sexually explicit conduct, namely, defendant spreading and penetrating Victim A's vagina. Defendant was aware of what the images depicted because it was she who created these pictures by spreading and penetrating Victim A, and because she had written about engaging in that conduct beforehand. Additionally, although the United States only needs to prove one jurisdictional circumstance, both were proven:

| Must Prove Only One of Two | Both Were Proven |
|---|---|
| Visual depiction had been mailed, shipped, or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer; **OR** | Photographs were sent to Tommy Pape Pape on June 28, 2022 using the internet, and more specifically, via defendant's Mega.nz account; and |
| Visual depiction had been produced using material that had been mailed, shipped, or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer. | iPhone XS Max used to produce photographs was manufactured in China and shipped to the United States. (Ex. 76) |

## V.    COUNT NINE:  DEFENDANT POSSESSED OVER 1,700 CHILD PORNOGRAPHY VIDEOS AND IMAGES IN HER MEGA ACCOUNT

Finally, the United States proved that defendant possessed over 1,700 videos and images of child pornography in her Mega.nz account on November 8, 2019, including images of Victim N and images and videos of Victim A. (Exs. 3, 27-64.) Given the sensitive and distressing nature of the videos alleged in Count Nine, which were found in folders in defendant's Mega account called "watersports," "favorites," and "girls under 6," the United States played only a few seconds of each video. (Exs. 62-64.) These short clips, together with Special Agent Ruiz's testimony and his video review of the Mega

account (Ex. 3), showed that defendant possessed child pornography depicting prepubescent children other than Victim A and Victim N.

Lastly, the United States proved both jurisdictional circumstances, though only one need to be proven:

| Must Prove Only One of Two | Both Were Proven |
|---|---|
| Visual depiction had been mailed, shipped, or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer; **OR** | 1700+ child pornography images and videos were saved in defendant's Mega.nz account; and |
| Visual depiction had been produced using material that had been mailed, shipped, or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer. | iPhone X and iPhone XS Max used to produce Victims A and N images and videos within Mega.nz account were manufactured in China and shipped to the United States. (Ex. 76) |

## VI.  CONCLUSION

Defendant did not just have "fantasies" (Ex. 9) about sexually abusing babies and children -- she acted out her fantasies on Victim A and Victim N.  And not only did defendant produce child pornography videos and images of both victims so that she could have her fantasies of "licking," "fingering," and "playing" with babies and children come true, but she went so far as to devise a plan to babysit Victim A so that she could have sole control of, and access to, Victim A for the purpose of creating videos of herself "licking," "fingering," and "playing" with Victim A.  The United States proved this beyond a reasonable doubt at trial and, for the reasons discussed above, the Court should find defendant guilty of Counts One through Nine of the First Superseding Indictment.