CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
HOWARD SHNEIDER (Bar No. 309492)
(Email: Howard_Shneider@fd.org)
IJEOMA U. EKE (Bar No. 331938)
(Email: Ijeoma_Eke@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California  90012
Tel: 213-894-2854
Fax: 213-894-0081

Attorneys for Defendant
STEFANI KASEY MARIE STEVENS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEFANI KASEY MARIE STEVENS,<br><br>Defendant. | Case No.  ED CR-19-377-VAP<br><br>**Stefani Stevens' Closing Brief**<br><br><br>Hearing Date:    October 25, 2022<br>Hearing Time:   10:00 a.m. |

Stefanie Stevens, through her counsel, files her brief in support of closing argument.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

Dated: October 21, 2022          By   /s/ Howard Shneider

Howard Shneider
Ijeoma U. Eke
Deputy Federal Public Defenders
Attorneys for Stefani Kasey Marie Stevens

# Table of Contents

Table of Authorities ................................................................................................ iv

Introduction ............................................................................................................ 1

Statement of Facts .................................................................................................. 4

Argument ................................................................................................................ 7

    A.  The Court should find Stevens not guilty on all counts. ........................................ 7

    B.  The Court should find Stevens not guilty on count one. ....................................... 8

        1.  The government did not prove beyond a reasonable doubt that Stevens obtained custody or control of Minor A. ........................................................... 11

        2.  The government did not prove beyond a reasonable doubt that Stevens had a requisite mens rea. ........................................................................................... 11

        3.  The government did not prove the commerce element beyond a reasonable doubt. .................................................................................................................. 13

            a.  The government had to prove that Minor A was transported in or affecting interstate commerce in the course of the charged offenses. ..................... 13

               i.  Any transportation occurred before, not during, the charged offenses. 14

              ii.  The government's theory that intrastate travel on an interstate highway satisfied the commerce element is not supported by the evidence and fails as a matter of law. ...................................................................... 14

            b. The government's alternative commerce-element theory is not viable. ...... 18

               i.  Because the indictment does not charge an offer-based crime, the charging statute's offer-based option for establishing the commerce element is inapplicable. ................................................................... 18

              ii.  In any event, the only offer purportedly made by Stevens occurred during a face-to-face conversation and therefore was not communicated using a computer or other facility of interstate commerce. ................. 20

iii. If the offer-based commerce-element option is available at all, it requires the government to actually prove an offer-based crime, and it has not done so because the evidence does not permit a finding that Stevens had a requisite mens rea at the time she purportedly made the offer. ......................................................................... 22

C. The Court should find Stevens not guilty on counts two through seven. ............ 23

1. The government failed to prove who created each photo and video and failed to establish when each photo and video was created. ................................... 23

2. The images for counts two through four involving Minor N do not constitute sexually explicit conduct. ............................................................... 26

D. The Court should find Stevens not guilty on count eight..................................... 28

E. The Court should find Stevens not guilty on count nine...................................... 29

Conclusion ........................................................................................................ 30

1

**Table of Authorities**

2

**Cases**

3
4
*Bond v. United States*,
   572 U.S. 844 (2014)..................................................................13, 16

5
6
*Cleveland v. United States*,
   531 U.S. 12 (2000)........................................................................16

7
8
*Estate of Saunders v. C.I.R.*,
   745 F.3d 953 (9th Cir. 2014) ........................................................17

9
*Fowler v. United States*,
   563 U.S. 668 (2011)......................................................................16

10
11
*Gasho v. United States*,
   39 F.3d 1420 (9th Cir. 1994) ...................................................12, 21

12
13
*Gulf Oil Corporation v. Copp Paving Company, Inc.*,
   419 U.S. 186 (1974)......................................................................15

14
15
*In re Winship*,
   397 U.S. 358 (1970).....................................................................7, 8

16
17
*Jackson v. Virginia*,
   443 U.S. 307 (1979)........................................................................8

18
19
*Morissette v. United States*,
   342 U.S. 246 (1952)..................................................................11, 21

20
*Paritem Singh Poonian v. United States*,
   294 F.2d 74 (9th Cir. 1961) ......................................................12, 21

21
22
*Sebelius v. Cloer*,
   569 U.S. 369 (2013)......................................................................11

23
24
*United States v. D'Souza*,
   2012 WL 487638 (E.D. Cal. 2012) ................................................17

25
26
27
*United States v. Dost*,
   636 F. Supp. 828 (S.D. Cal. 1986), *aff'd*, *United States v. Wiegand*, 812
   F.2d 1239 (9th Cir. 1987) ................................................24, 25, 26

28

*United States v. Flyer*,
    633 F.3d 911 (9th Cir. 2011) ...................................................................27

*United States v. Hillie*,
    39 F.4th 674 (D.C. Cir. 2022)...............................................................25

*United States v. Horne*,
    474 F.3d 1004 (7th Cir. 2007) ...............................................................17

*United States v. Perkins*,
    850 F.3d 1109 (9th Cir. 2017) ...........................................................25, 26

*United States v. Rodriguez-Moreno*,
    526 U.S. 275 (1999)...............................................................................28

*United States v. Stinson*,
    647 F.3d 1196 (9th Cir. 2011) ...............................................................28

*United States v. Velazquez*,
    1 F.4th 1132 (9th Cir. 2021) ..................................................................8

**Statutes**

18 U.S.C. § 2251(a) ......................................................................................22

18 U.S.C. § 2251A................................................................................*passim*

18 U.S.C. § 2252A.........................................................................13, 26, 27

18 U.S.C. § 2256.........................................................................................24

18 U.S.C. § 2423...................................................................................15, 16

18 U.S.C. § 3232.........................................................................................28

**Other Authorities**

Federal Highway Administration,
    https://www.fhwa.dot.gov/interstate/faq.cfm ....................................15

*New Oxford American Dictionary* (3d ed. 2010) .............................11, 19

# Introduction

The Court heard testimony about disturbing conduct toward two children during the course of this trial. But the disturbing nature of the evidence alone does not mean Stefani Stevens is guilty. The Court is duty-bound to apply the law to the facts of the case. When it does, the only proper verdicts under the law are not guilty.

This is especially so as to count one. As the most serious count, carrying a 30-year mandatory minimum, one would expect the government to carefully and meticulously prove its case. But if fell far short. The most glaring deficiency in the government's case for count one is a failure to prove the jurisdictional element. The only evidence that Minor A was transported in or affecting interstate commerce was vague testimony about a route that D.G. drove on the Interstate 10.[1] First of all, her drive occurred *before* (not in the course of) the alleged crime, as required by the law, which should end the inquiry. In any event, there was no evidence about whether the I-10 is in fact an interstate highway or what it means to be an interstate highway. And there was zero evidence about how driving a short, unknown distance on the I-10 from Hemet to Yucaipa—a fully *intra*state trip—affects *inter*state commerce in any fashion. Furthermore, the Court should hold, as a matter of law, that merely using an interstate highway during a brief intrastate trip cannot satisfy the charging statute's interstate-commerce element. Thus, the government failed to prove the jurisdictional element involving transport in or affecting interstate commerce and failed to prove count one.

The government's alternate jurisdictional theory of an offer communicated by a means of interstate commerce fairs no better. For the reasons stated in the defense Trial Memorandum Regarding Count One, Dkt. 67, because the government did not charge

---

[1] Given the public nature of this filing, the defense refers to each child victim by the first initial of their first name, and refers to the other relatives of the children by their initials rather than their full names.

1

Stevens with making an offer, and only with obtaining custody of the child, the Court should hold, as a matter of law, that the government cannot establish jurisdiction through an offer theory. But even if the offer theory were a valid basis for jurisdiction, the government fell far short of proving this element also. The only possible offer D.G. testified to was an offer that Stevens made to D.G. *in person* at one of their homes sometime in April 2019. This in-person conversation occurred well before the first text messages were sent to facilitate the previously-offered babysitting. In particular, the text messages sent after that in-person conversation involved D.G. asking Stevens if she would want to watch the children if D.G. found a job, and the two of them hashing out logistical arrangements. Because the only conceivable offer was made in person, and not by a means or facility of interstate commerce, the government did not meet the jurisdictional element, even if an offer theory is viable despite the substantive crimes actually alleged in the indictment. By failing to establish the jurisdictional element of count one, the government failed to prove its case and the Court must find Stevens not guilty on count one.

As for the counts two through five, the evidence shows that G.G. had access to Stevens' iPhone, Apple Watch, her online accounts, and Minor N. Nonetheless, Agent Ruiz failed to treat G.G. as a suspect and did not investigate him or his brother L.G. in any way. He did not search or seize and of G.G.'s devices, did not show G.G. redacted images of his daughter to determine whether G.G. had ever seen the photos, and did not investigate G.G. further even after Minor N stated in an interview that her father had seen a presumably nude video of her taken at the same time as a nude photo of her.

Agent Ruiz testified that he did not view the raw data embedded in the photos of Minor N. He reviewed only a limited set of data associated with each photo, if it was available, such as the EXIF data. Agent Hornberger explained that he has the ability to review the raw data associated with images and videos by using Encase or similar software. Nonetheless, none of the images or videos in the case were in fact reviewed

2

using such software, and accordingly the agents could not testify as to what the raw data showed or did not show. For count three, the November 4, 2018 photos, there was no metadata at all, and it is therefore impossible to know what date those photos were actually taken. Moreover, the forensic image of Stevens's iPhone was corrupted and could not be viewed by the defense's forensic expert. Thus, it was not possible to see if the files on the online accounts also appeared on Stevens' phone. Because of the doubts about whether other people were involved with photographing and distributing photographs of Minor N and uncertainty about when the photos were taken, the government has failed to prove its case as to counts two through five. In addition, the photos of Minor N in counts two, three, and four do not meet the legal definition of child pornography, and for that reason also the government falls short on those counts.

Counts six through eight suffer from similar deficiencies. Because no one reviewed the raw data associated with those files and the unreliability of Agent Ruiz's testimony as to the significance of any available metadata, it is unclear what day those images and videos were created. Given G.G.'s access to Stevens' online accounts, it is also unclear who actually sent the images in count eight to the other Mega user. Accordingly, Stevens is not guilty of counts six through eight.

The government also failed to prove count nine because it did not show that Stevens had possession of the Mega servers, which are located in New Zealand. The government alleges that Stevens "knowingly *possessed* a Mega.nz account linked to her email[.]" Dkt. 70 (emphasis added). The charging statute requires the government to prove that Stevens possessed the physical thing containing the videos, namely, Mega's servers. Because Mega, not Stevens, exercised dominion and control over those servers, the government cannot prove possession here. Stevens is not guilty of count nine.

//

//

//

3

### Statement of Facts[2]

D.G. testified about the babysitting arrangements with Stevens. D.G. explained that sometime around April 2019, she and Stevens met in person and D.G. raised the idea of going back to work. It was during that in-person conversation that Stevens brought up the topic of babysitting D.G.'s children. The government characterizes this in-person conversation as an offer from Stevens to D.G. The first mention of babysitting in the text messages was on April 28, when D.G. texted Stevens and asked, "If I got a job would you wanna watch the kids?" Gov't Ex. 95 at 1.[3] From there, the two discussed the possibility of babysitting. The next text message about babysitting came on May 21, again from D.G. to Stevens: "So what all do you want me to bring tomorrow for the kids?" Gov't Ex. 2. At this point it had been established that Stevens would babysit the children, and the two were working out the logistical arrangements. The next day, May 22, text messages show that D.G. dropped the kids off at Stevens' home and picked them up later that same day. On cross-examination, D.G. explained that on some occasions Stevens picked up the children from D.G.'s home or another location, but that on May 22 D.G. dropped her children off at Stevens' home.

D.G. initially testified that she took "the 74 to the 79 to the 10" to get from Hemet to Yucaipa. Only after the government followed up by asking if the 10 was the same as the "Interstate 10" did D.G. agree that she was referring to that road. D.G. did not testify about what makes a road an interstate highway or why she believed "the 10" was

---

[2] The defense summarizes only the facts most pertinent to its arguments below. To the extent necessary, the defense will go into more factual detail during closing arguments in court. Furthermore, because transcripts are not available, the facts cited herein are based on the defense's best recollection of the trial evidence.

[3] Although the text message exhibits are in evidence, they are also attached here for ease of reference.

in fact the Interstate 10. D.G. also did not testify about how long she drove on the I-10 or what portion of her trip from Hemet to Yucaipa was on the I-10.

Further, D.G. testified that she had to drive to Yucaipa regardless of whether she was dropping her children off at Stevens' home. Because her job was in Yucaipa, and she had to drive to Yucaipa to get to her job, the drive to Yucaipa on May 22 would have happened whether or not she dropped her kids off at Stevens' home.

Dominic Davila from Apple testified that the iPhones involved in the case were manufactured in China. Davila also explained how Apple's Keychain software functions. He testified that if one person shares access to another person's iCloud account, then both of them can access all the data, including usernames and passwords, stored within the iCloud Keychain function. Government Exhibit 78 shows that G.G. accessed and downloaded applications on one of the iPhone X devices that the government argued belonged to Stevens. This information is available on the iTunes Updates tab in the Exhibit 78 Excel spreadsheet. A copy of that tab, filtered down to include only G.G.'s name, and hiding irrelevant columns, is attached to this brief. *See* Gov't Ex. 78, iTunes Updates tab (showing that for over 500 rows G.G. accessed and downloaded applications on the iPhone, including Mega, Kik, Gmail, Google Drive, and Hangouts). Government Exhibit 76, in the Registrations_Device tab, shows that the space gray iPhone X—which the government claims belonged to Stevens—was in fact registered in G.G.'s name. A copy of that tab, filtered down to include only G.G.'s name and hiding irrelevant columns, is attached to this brief. Another tab in government Exhibit 76, the AMS Subscriber_Device tab, shows G.G.'s name associated with Stevens' email address. A copy of that tab, filtered down to include only G.G.'s name and hiding irrelevant columns, is also attached to this brief. And government Exhibit 78, at the iTunes Subscriber tab, also shows G.G. associated with Stevens' email and iTunes account. A copy of that tab, hiding irrelevant columns, is attached to this brief.

5

Agent Ruiz testified about the investigation that led to Stevens, statements Stevens made during interviews, and the contents of online accounts found after Stevens provided consent for Agent Ruiz to take over specific accounts. On cross-examination, Agent Ruiz conceded that he did not treat G.G. as a suspect after Agent Ruiz spoke with Stevens, even though G.G. had access to Stevens' devices and online accounts and lived in the same home.

Agent Ruiz testified about a limited set of EXIF metadata embedded in some of the images involving Minor N and some of the videos involving Minor A. But Agent Ruiz explained that he did not review the raw data associated with any of those images or videos. He admitted that the raw data could show important information, such as whether an image or video had been altered by Photoshop. Agent Ruiz further testified that he is not an expert in viewing raw data; thus showing his lack of expertise when it comes to analyzing the full scope of information associated with image and video files. So although he testified that he reviewed some metadata, it is unknown exactly what he reviewed. In the best case scenario, Agent Ruiz reviewed only a portion of the full universe of information. In order to review that full universe of information, he would have had to review the raw data in a viewer like Encase.

Unlike Agent Ruiz, Agent Hornberger was a forensics expert who could have reviewed the raw data from the Mega images and videos. But Agent Hornberger did not review the raw data. As a result, there is no evidence before the Court about what the raw data contains from the various photos and videos the government used as exhibits at trial.

Agent Ruiz also testified that an Apple Watch from Stevens' wrist was left at the residence and not seized on the day of the search warrant. Only after G.G. went through the Apple Watch on his own was Agent Ruiz made aware that there was contraband on the Apple Watch that was supposedly discovered by G.G. Because no one supervised G.G.'s access to the Apple Watch, he may have added files to the Apple Watch. Agent

Ruiz also testified that Stevens' iPhone was not password protected, and so anyone could access the phone and its contents.

Agent Ruiz further testified that he never sought warrants or did any further investigation into the contents of the Mega account beyond the account takeover. He also did not seek warrants or do any further investigation of the Wickr or Chatiw platforms on which Stevens said she was threatened by another user. In Stevens' statement to Agent Ruiz, she said she took approximately 8-10 photos of Minor N, but there were approximately 40 photos of Minor N on Stevens' online accounts.

Agent Hornberger testified that the forensic images of the digital devices seized at the Stevens home are now corrupted files, meaning the government can no longer gain access to those forensic images. It is therefore impossible to cross-reference Stevens' iPhone to see if there were any child pornography files, a Mega account, or any other evidence to support that it was Stevens who was responsible for the content on Mega or the other online accounts.

Both parties played clips of Minor N's November and December 2019 interviews. In the clip played by the government, Minor N described how Stevens photographed her and told her what positions to take during the photographing. But in the clips from the November 2019 interview, Minor N said Stevens never took nude photos of her and that she had nothing negative to say about Stevens. Instead, Minor N's statements about negative events involved her cousin inappropriately touching her private parts in a closet. In the December 2019 interview, Minor N stated the Stevens showed one of the nude videos she took of Minor N in the bathroom to G.G. Def. Ex. 225. This, despite the fact that G.G. denied ever seeing any nude photos or videos of Minor N.

<b>Argument</b>

**A. The Court should find Stevens not guilty on all counts.**

The Due Process Clause requires the government to prove each element of each alleged crime beyond reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). This

7

constitutional burden of proof "plays a vital role in the American scheme of criminal procedure" because it's "a prime instrument for reducing the risk of convictions resting on factual error" and it "provides concrete substance for the presumption of innocence." *Id*. at 363 (cleaned up); *see also United States v. Velazquez*, 1 F.4th 1132, 1137 (9th Cir. 2021) (discussing interests served by reasonable-doubt standard). "To this end, the reasonable-doubt standard is indispensable, for it impresses on the trier of fact the *necessity of reaching a subjective state of certitude* of the facts in issue." *Winship*, 397 U.S. at 364 (cleaned up) (emphasis added); *see also id.* (factfinder must be convinced of guilt with "utmost certainty."); *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) ("By impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself.") (cleaned up).

Given the evidence presented at trial, the Court should not reach a subjective state of near certitude of Stevens' guilt because the government has not proved each element of each offense beyond a reasonable doubt. In fact, the government has failed to prove *any* element of *any* count. Without waiving or forfeiting that general insufficient-evidence claim, Stevens will discuss below certain particular reasons why the Court should render not-guilty verdicts.[4]

**B. The Court should find Stevens not guilty on count one.**

Count one alleges a violation of 18 U.S.C. § 2251A(b), but the three subsections of that provision define three separate crimes, and the indictment used language covering

---

[4] Although Stevens is preserving an insufficient-evidence claim for appeal, it's important to understand that this Court is not considering such a claim, which would require it to view the evidence in the light most favorable to the government. *Jackson*, 443 U.S. at 319. At a bench trial, the Court (like a jury) is the factfinder, with the ability and duty to weigh the evidence.

all of them, to some extent. Dkt. 70 at 1-2. Despite that, the government has not pursued the crime defined by § 2251A(b)(2)(B), which requires the minor herself to render assistance in engaging in sex acts for the purpose of producing child pornography. Thus, only the other two subsections are at issue, and they cover:

- "Whoever purchases or otherwise obtains custody or control of a minor, or offers to purchase or otherwise obtain custody or control of a minor . . . with knowledge that, as a consequence of the purchase or obtaining of custody, the minor will be portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit conduct[.]" 18 U.S.C. § 2251A(b)(1).

- "Whoever purchases or otherwise obtains custody or control of a minor, or offers to purchase or otherwise obtain custody or control of a minor . . . with intent to promote . . . the engaging in of sexually explicit conduct by such minor for the purpose of producing any visual depiction of such conduct[.]" 18 U.S.C. § 2251A(b)(2)(A).

Despite § 2251A(b)'s preliminary clause—which covers purchasing a minor, otherwise obtaining custody and control a minor, and offers to do those things—the indictment alleges only that Stevens "obtained custody and control of Victim 1," not that she made a prohibited purchase or offer.[5] Dkt. 70 at 1-2. Accordingly, only the following statutory text applies to the *charged* crimes:

- "Whoever . . . obtains custody or control of a minor . . . with knowledge that, as a consequence of . . . obtaining of custody, the minor will be portrayed in a

---

[5] The indictment refers to Victim 1 and Victim 2. Victim 1 is Minor A and Victim 2 is Minor N.

9

visual depiction engaging in . . . sexually explicit conduct[.]"  18 U.S.C. § 2251A(b)(1).[6] *We'll call this the knowledge-of-consequence crime.*

- "Whoever . . . obtains custody or control of a minor . . . with intent to promote . . . the engaging in of sexually explicit conduct by such minor for the purpose of producing any visual depiction of such conduct[.]"  18 U.S.C. § 2251A(b)(2)(A). *We'll call this the intent-to-promote crime.*

A person described in these subsections may only be punished "if any of the circumstances described in subsection (c) of [the] section exist." 18 U.S.C. § 2251A(b). Those circumstances "are that – (1) in the course of the conduct described in such subsections the minor or the actor traveled in or was transported in or affecting interstate or foreign commerce; (2) any offer described in such subsections was communicated or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mail; or (3) the conduct described in such subsections took place in any territory or possession of the United States." 18 U.S.C. § 2251A(c). Thus, the government must prove—as an element of each crime—that one of these circumstances is applicable. The third circumstance plainly doesn't apply because the conduct allegedly occurred in a state, not in a territory or possession of the United States. The indictment therefore only alleges the other two interstate-commerce circumstances. Dkt. 70 at 2.[7]

---

[6] Again, the government hasn't pursued a theory that the minor herself rendered assistance in engaging in sex acts, so the "assisting another person to engage in" language in § 2251A(b)(1) is inapplicable and has therefore been removed here.

[7] Although the indictment also includes the statute's "foreign commerce" language, the government has not proffered any independent foreign-commerce theory, so this brief will generally refer to "interstate commerce."

10

1    With all this in mind, it's necessary to separately consider the two crimes

2  encompassed by count one because the Court can only convict on that count if the

3  government proved beyond a reasonable doubt all the elements for at least one of those

4  crimes; in other words, it can't mix and match the elements of the distinct offenses.

5  That being said, some elements are the same and others are similar.

6    **1. The government did not prove beyond a reasonable doubt that Stevens**

7        **obtained custody or control of Minor A.**

8    For both crimes, the government had to prove that Stevens obtained custody and

9  control of Minor A. Assuming Stevens had the requisite "custody or control" of Minor

10  A once her mother dropped off the child for babysitting, Stevens did not "obtain" that

11  custody or control. That term is not defined in the statute, but the plain meaning of the

12  verb requires active, not passive, conduct by the defendant. *See Sebelius v. Cloer*, 569

13  U.S. 369, 376 (2013) (interpretation begins with statutory text, and unless otherwise

14  defined, terms generally given their ordinary meaning); *New Oxford American*

15  *Dictionary* at 1212 (3d ed. 2010) (defining "obtain" as "get, acquire, or secure

16  (something)"). Because Stevens only passively received Minor A, the government did

17  not prove that she actively "obtained" the child.

18    **2. The government did not prove beyond a reasonable doubt that Stevens had**

19        **a requisite mens rea.**

20    For the § 2251A(b)(1) crime, the government had to prove that Stevens knew that a

21  consequence of obtaining custody or control of Minor A was that the child would be

22  portrayed in an image engaging in sexually explicit conduct. Likewise, for the

23  § 2251A(b)(2)(A) crime, the government had to prove that Stevens obtained custody or

24  control with the intent to promote Minor A engaging in sexually explicit conduct for

25  the dominant, significant, or motivating purpose of producing an image. For each

26  crime, Stevens had to have the requisite mens rea at the moment she obtained custody

27  or control of Minor A. *See Morissette v. United States*, 342 U.S. 246, 251-52 (1952)

28

("Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil."); *Gasho v. United States*, 39 F.3d 1420, 1429 (9th Cir. 1994) ("It is fundamental that a person is not criminally responsible unless criminal intent accompanies the wrongful act."); *Paritem Singh Poonian v. United States*, 294 F.2d 74, 76 (9th Cir. 1961) (it's "hornbook law that in every crime there must be a joint union of act and intent.").

Assuming that the images of Minor A qualify as visual depictions of her engaging in sexually explicit conduct, the government did not prove that Stevens knew that such images would be a consequence of her obtaining custody or control, or that she obtained custody or control with the specific intent to produce such images. Rather, the evidence showed that a babysitting arrangement was made for a legitimate purpose (namely, the mother's work schedule), thereby establishing that any transfer of custody or control would have happened regardless of any intent to produce an image on the day at issue. The images therefore weren't a "consequence" of obtaining custody or control of Minor A that day; they were, at most, merely incidental. It follows that Stevens did not have the requisite mens rea for either offense.

The government also failed to prove the mens rea elements for another reason. Under § 2251A(b)(1), Stevens had to act with the knowledge that Minor A would "be portrayed in a visual depiction engaging in . . . sexually explicit conduct[.]" And under § 2251A(b)(2), she had to have the intent to promote "the engaging in of sexually explicit conduct by [the] minor for the purpose of producing any visual depiction of such conduct[.]" The plain meaning of these phrases reaches only the minor affirmatively engaging in the sex acts. At trial, however, the government contended only that Stevens committed a sex act *upon* Minor A, an infant. The baby herself did not engage in any sex acts.

12

### 3. The government did not prove the commerce element beyond a reasonable doubt.

The federal government has only those powers enumerated in the Constitution, so every law enacted by Congress must be based on one or more of those powers. *Bond v. United States*, 572 U.S. 844, 854 (2014). Unlike the states, the federal government lacks general police-power authority, so "Congress cannot punish felonies generally." *Id*. (cleaned up). "A criminal act committed wholly within a State cannot be made an offence against the United States, unless it have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States." *Id*. (cleaned up).

Among other things, the Constitution gives Congress the ability "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]" U.S. Const., Art. I, § 8, cl. 3. Congress invoked that power to enact § 2251A, as reflected in subsection (c). In doing so, however, it did <u>not</u> confer federal jurisdiction based on an image of child pornography (or material containing such an image) being transported in interstate commerce, or being produced with materials that were so transported, as it has in other statutes. *See*, *e.g.*, 18 U.S.C. § 2252A(a)(4)(B). That makes sense given that § 2251A focuses on the transfer of children with an improper mens rea rather than on the ultimate creation of child pornography. To ensure that the statute reaches only such conduct Congress can legitimately regulate under the Commerce Clause, the interstate commerce circumstances described in § 2251A(c) are quite narrow.

### a. The government had to prove that Minor A was transported in or affecting interstate commerce in the course of the charged offenses.

To satisfy the interstate-commerce element for each crime, the government had to prove that, "in the course of the conduct described in" subsection (b)(1) (the knowledge-of-consequence crime) or subsection (b)(2)(A) (the intent-to-promote

13

crime) "the minor or the actor traveled in or was transported in or affecting interstate or foreign commerce[.]" 18 U.S.C. § 2251A(c)(1). Stevens ("the actor") did not move, and Minor A ("the minor") traveled only within the State of California, but the government contends that it nevertheless met its burden by showing that Minor A's mother drove on an interstate highway when transporting the child to Stevens for babysitting. It is wrong.

### i.   Any transportation occurred before, not during, the charged offenses.

The government ignores that any transportation had to occur "in the course of" the prohibited conduct. If Stevens obtained custody or control of Minor A at all, that conduct occurred only at the point when the baby's mother dropped her off. Any transportation *before* the children were dropped off did not occur "in the course of" any conduct at issue in the offenses. That should be the end of the matter.

### ii.   The government's theory that intrastate travel on an interstate highway satisfied the commerce element is not supported by the evidence and fails as a matter of law.

Even if the Court could get past the fact that the transportation did not occur in the course of the prohibited conduct, the government's position depends entirely on the flawed premise that any use of a road labeled as an "interstate highway" necessarily involves traveling or transporting in or affecting interstate commerce. But it did not even prove that the road it identified was an interstate highway. D.G. initially testified that she took the 74 to the 79 to the 10 to get form Hemet to Yucaipa. Only after the government followed up by asking if the 10 was the same as the "Interstate 10" did D.G. agree that she was referring to that road. But D.G. did not explain how she knew part of her trip was on the Interstate 10, what an interstate highway is, or what properties of the road she was on make it an interstate highway. All D.G.'s testimony established is that she knows she was on a road that someone else with knowledge

14

1 claimed was the I-10. It's the government's obligation to prove that she was in fact on
2 the I-10, which it failed to do.

3      If the Court nevertheless finds both that D.G. used the I-10 and that that road is an
4 "interstate highway," the government still presented no evidence about what that
5 means. Pointing to the label "interstate" is not enough to prove beyond a reasonable
6 doubt that a road has particular characteristics such that any intrastate use of it
7 (however minor) can satisfy § 2251A(c)(1). Given the complete failure of proof on this
8 matter, the Court need go no further.

9      If it does do so, the Court should hold, as a matter of law, that mere *intra*state travel
10 on an "interstate highway" doesn't satisfy § 2251A(c)(1). First of all, despite the label,
11 individual states built, own, and operate the "interstate highways" within their borders,
12 albeit with some federal funding.[8] Thus, they are no different from any other intrastate
13 roads in any meaningful way. *See Gulf Oil Corporation v. Copp Paving Company, Inc.*,
14 419 U.S. 186, 196-99 (1974) (company making intrastate sales of asphalt was not
15 engaged in interstate commerce merely because the asphalt was later used to make
16 interstate highways). Even if they could be distinguished, a great deal of car travel
17 within a state, and most travel in urban areas, will involve interstate highways en route
18 (as the government claims happened here when Minor A's mother dropped her children
19 off at the babysitter a relatively-short distance away). Therefore, whether confined to
20 "interstate highways" or not, the government's simplistic using-roads-equals-interstate-
21 commerce theory, if accepted here, would have extremely broad implications with
22 regard to a multitude of statutes where traveling or transporting in interstate commerce
23 has long been understood as requiring movement from one state to another. *See*, *e.g.*,
24 18 U.S.C. § 2423(a) (transportation of minor in interstate commerce for prostitution or

25

26 ───────────────
   [8] *See* U.S. Department of Transportation, Federal Highway Administration,
27 https://www.fhwa.dot.gov/interstate/faq.cfm.

28                                    15

other sexual activity); 18 U.S.C. § 2423(b) (traveling in interstate commerce for purpose of engaging in illicit sex). It would also open the door to new statutes federalizing local criminal activity based on nothing more than the use of a road partially built or maintained with federal funding. For these reasons, interpreting § 2251A(c)(1) in the manner suggested by the government would render the statute unconstitutional by expanding federal criminal jurisdiction to purely intrastate matters beyond Congress's reach. *See Bond*, 572 U.S. at 854; *see also Fowler v. United States*, 563 U.S. 668, 677 (2011) (rejecting interpretation of statute that "would transform a federally oriented statute into a statute that would deal with crimes, investigations, and witness tampering that, as a practical matter, are purely state in nature."). But that should be beside the point because the plain text of § 2251A(c)(1) reflects that Congress did not intend that result; it certainly didn't express such an intent clearly and unequivocally. *See Bond*, 572 U.S. at 848 ("Because our constitutional structure leaves local criminal activity primarily to the States, we have generally declined to read federal law as intruding on that responsibility, unless Congress has clearly indicated that the law should have such reach."); *id*. at 858-59 ("[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers. . . . Perhaps the clearest example of traditional state authority is the punishment of local criminal activity. Thus, we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction.") (cleaned up); *Cleveland v. United States*, 531 U.S. 12, 25 (2000) ("[U]nless Congress conveys its

16

purpose clearly, it will not be deemed to have significantly changed the federal-state balance in the prosecution of crimes.") (cleaned up).[9]

_____

[9] The cases cited by the government for the broad proposition that traveling in, or being transported in, an interstate highway satisfies the commerce element are inapposite. *United States v. Ballinger* discusses a different statute, which punishes those who use channels and instrumentalities of interstate commerce. 395 F.3d 1218 (11th Cir. 2005). The statute at issue there banned the defendant's conduct, "which entailed weeks of travel in a van (an instrumentality of commerce) along interstate highways (a channel of commerce) and at least *six separate interstate border crossings*, all for the specific purpose of spreading the evil of church burning through *four different states*." *Id.* at 1228 (emphasis added). The multiple interstate border crossings in *Ballinger* are a far cry from the short intrastate drive here. *United States v. D'Souza* is a district court order mentioning that the defendant used "interstate technologies and highways" in violating an enticement-of-a-minor statute requiring the government to prove that he used a "facility or means of interstate of foreign commerce," but it's unclear whether that defendant's conduct included using interstate highways for *inter*state travel. 2012 WL 487638, *1-2 (E.D. Cal. 2012). *United States v. Horne* is a Seventh Circuit opinion including an offhand comparison of the internet to "an avenue of interstate commerce, like an interstate highway or long-distance telephone service." 474 F.3d 1004, 1006 (7th Cir. 2007). The other cases cited by the government are even farther afield, addressing different statutes and discussing in passing the notion that interstate commerce can include driving a car across state lines. None of these cases are binding precedent. And they aren't even persuasive authority on the matter given that the cited statements were made in passing, without any analysis or citation to any supporting authority, and in much different circumstances. *Cf. Estate of Saunders v. C.I.R.*, 745

Finally, the government put on no evidence regarding how long D.G. was on the I-10 or what portion of her trip from Hemet to Yucaipa was on the I-10. It is possible the portion of the trip on the I-10 was as little as a few minutes. But we cannot know because the government put on no evidence in that regard. Similarly, we do not know the distance she traveled on the I-10. She may have been on the I-10 for as little as a quarter of a mile. Again, we cannot know because the government put on no evidence as to those details. Furthermore, D.G. testified that she had to drive to Yucaipa regardless of whether she was dropping her children off at Stevens' home because that's where she worked. And the trial evidence does not permit the inference that she would not have driven on the I-10 but for stopping at Steven's home first.

For all these reasons, the government's evidence was woefully inadequate to prove § 2251A(c)(1)'s commerce element, so the Court must acquit Stevens on count one.

**b. The government's alternative commerce-element theory is not viable.**

    **i.   Because the indictment does not charge an offer-based crime, the charging statute's offer-based option for establishing the commerce element is inapplicable.**

The government's alternative interstate-commerce theory—that there was purportedly an "offer" that was communicated via a means or facility of interstate commerce—is inapplicable given the plain text of the statute and the indictment. Section 2251A(b) requires the government to prove that one "of the circumstances

_____

F.3d 953, 960-61 (9th Cir. 2014) ("[I]n our circuit, statements made in passing, without analysis, are not binding precedent. Rather, where it is clear that a statement is made casually and without analysis, where the statement is uttered in passing without due consideration of the alternatives, or where it is merely a prelude to another legal issue that commands the panel's full attention, it may be appropriate to re-visit the issue in a later case.") (cleaned up).

18

described in subsection (c)" exists. The government's alternative theory rests on the provision providing that "[t]he circumstances referred to in subsections (a) and (b) are that . . . *any offer described in such subsections* was communicated or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mail[.]" 18 U.S.C. § 2251A(c)(2) (emphasis added). As explained above, subsection (b) covers purchasing a child, otherwise obtaining custody and control a child, and offers to do those things. But the indictment alleges only that Stevens "obtained custody and control of" Minor A, not that she made a prohibited purchase or offer. Dkt. 70 at 1-2. Thus, the government did not charge the § 2251A(b) crime with an offer element, so "any offer described in" that subsection is not within the "circumstances" for the *charged* offenses, each of which instead includes the element of actually obtaining custody and control.

After Stevens identified this problem (Dkt. 67), the government obtained a superseding indictment that added the minor-transported-in-interstate-commerce allegation (§ 2251A(c)(1)), but significantly, it did <u>not</u> allege an alternative theory that Stevens violated subsection (b) by "offer[ing] to . . . obtain custody or control of" Minor A. Dkt. 70 at 1-2. It belies common sense and the plain text of the statute to conclude that being unable, or at least unwilling, to charge an offense based on an offer described in subsection (b), the government can still rely on the "any offer described in such subsections" provision in subsection (c)(2) to provide the jurisdictional basis for the significantly-different subsection (b) crimes it did allege.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> **ii.   In any event, the only offer purportedly made by Stevens occurred during a face-to-face conversation and therefore was not communicated using a computer or other facility of interstate commerce.**

Even if the government could generally invoke § 2251A(c)(2) to establish federal criminal jurisdiction for non-offer crimes charged under § 2251A(b), it did not prove the factual predicate for that commerce element—that Steven made an offer via a facility of interstate commerce. It is important to focus on what constitutes an offer and when, if at all, an offer was made in this case. First, there's plainly a difference between *making* an offer and *accepting* one, and § 2251A(b) only prohibits the former. Thus, the statute requires *the defendant* to make an offer. The dictionary definition of "offer" is to "present or proffer (something) for (someone) to accept or reject as so desired." *New Oxford American Dictionary* at 1217 (3d ed. 2010). At most, the trial evidence showed that Stevens offered babysitting services only once, and that was in person, not via text or any other facility of interstate commerce, as required by § 2251A(c)(2).

D.G. testified that the first time babysitting came up was when her and Stevens spoke in person at one of their homes in approximately April 2019. During that in-person conversation, D.G. explained she may go back to work. Stevens purportedly offered to babysit D.G.'s children if D.G. chose to return to work. That in-person event is the only evidence that Stevens made anything even resembling an offer.

To the extent there were text messages after the in-person conversation, they involved follow-up efforts from D.G. to confirm Stevens could babysit the children or were mere arrangements made to facilitate the transfer of custody or control by dropping off the children. All the text messages were separate and distinct from any prior, in-person offer to babysit.

The first time babysitting came up in the text messages between D.G. and Stevens was on April 28. D.G. texted Stevens and asked, "If I got a job would you wanna watch

the kids?" Gov't Ex. 95 at 1. From there, the two further discussed the logistical details of the possible babysitting arrangement. The next text message about babysitting came on May 21, again from D.G. to Stevens. The message read, "So what all do you want me to bring tomorrow for the kids?" Gov't Ex. 2. At this point it had been established that Stevens would babysit the children, and the two were simply making the arrangements. The next day, May 22, text messages show that D.G. dropped the children off at Stevens' home and picked them up later that same day. None of the text messages involve an offer from Stevens. At most, the April 28 texts demonstrate an offer from D.G. to Stevens requesting that Stevens babysit the children. And the May 21 and 22 messages show D.G. and Stevens solidifying the details of a previously-made babysitting agreement.

The government misunderstands the holding of *United States v. Clemans*, 808 Fed. App'x 509 (9th Cir. 2020), an unpublished memorandum disposition. That case included a one-paragraph discussion of the issue of whether a defendant could be held criminally liable if he made an offer through an intermediary. The court concluded that "even though Clemans conveyed his offers to Tandeg [a third party], and instructed her to convey those offers to parents, that conduct was sufficient to meet § 2251A's jurisdictional nexus." *Id.* at 510. The entirety of the holding is that an offer can be made through an intermediary. *Clemans* does not stand for the proposition that an offer may be made by anyone at any time. Far from it, the case states the offer must come from the defendant and go to the intended recipient, albeit through an intermediary.

At bottom, the only possible offer from Stevens occurred in person, and the government cannot establish there was an offer communicated using a computer or other facility of interstate commerce. Accordingly, it's offer theory of commerce must fail.

iii. **If the offer-based commerce-element option is available at all, it requires the government to actually prove an offer-based crime, and it has not done so because the evidence does not permit a finding that Stevens had a requisite mens rea at the time she purportedly made the offer.**

Even if the government had charged an offer-based offense and could overcome the fact that the offer was made in person, it would still have had to prove that Stevens had the requisite mens rea at the time of the offer. As discussed in Part B.2 above, the government must prove of unity of act and intent for each crime charged. Thus, Stevens had to have the requisite mens rea at the moment she made the offer to babysit during the in-person conversation in April 2019. *See Morissette*, 342 U.S. at 251-52; *Gasho*, 39 F.3d at 1429*; Paritem Singh Poonian*, 294 F.2d at 76 (9th Cir. 1961) (it's "hornbook law that in every crime there must be a joint union of act and intent."). The government cannot prove that the required mens rea was present.

D.G. testified that the purported in-person offer from Stevens occurred in approximately April 2019; well before the Mega chats allegedly between Stevens and Tommy Pape Pape, which began on May 21. The gap in time between the offer and the evidence of intent does not permit a finding that Stevens had any intent to produce child pornography involving Minor A at the time she made the offer in April 2019. Thus, the offer could not fall within the "circumstances referred to in" subsection (b), as required by § 2251A(c)(2), because the required intent is absent.

The government's interpretation of *Clemans* and § 2251A as to the mens rea element turns the statute on its head. It would make subsection (a) completely superfluous. That subsection criminalizes the parent making an offer. If it did not matter who made an offer in the first place, then there would be no need to distinguish between the parent and the person obtaining custody of the child. The government's reading of the statute highlights the problem with the government mixing and matching

22

elements to prove its case as it sees fit, irrespective of what the law requires. What the statute requires for § 2251(a) is that the parent have the requisite mens rea, whereas subsection 2251(b) requires the person obtaining the child have the requisite mens rea. Under the government's reading, and under the facts of our case, it would mean that if D.G. made an offer at a time when Stevens had the requisite mens rea, then that would be sufficient to prove the crime. That reading of the statute is divorced from the text and plain meaning of the words of the statute, and would greatly expand the scope of individuals subject to a crime with a 30-year mandatory minimum.

The government complains that an interpretation contrary to its broad reading would lead to absurd results. But the government ignores that there are a host of other federal criminal statutes that punish individuals for engaging in enticement of minors and production and distribution of child pornography. Section 2251A is not the only statute available to punish such conduct. Congress crafted a narrow statute with draconian penalties to punish a specific subset of individuals. Stevens' conduct does not fall in that category.

For all of the above reasons, the government cannot establish the commerce element through an offer-based theory. That failure, in addition to the inability to prove a transport-theory of commerce, is fatal to the government's case. The Court must acquit Stevens of count one.

**C. The Court should find Stevens not guilty on counts two through seven.**

  **1. The government failed to prove who created each photo and video and failed to establish when each photo and video was created.**

Counts two through seven allege violations of 18 U.S.C. § 2251(a). Dkt. 70 at 3. The first four of those counts address Minor N. But the government has failed to prove beyond a reasonable doubt that Stevens was responsible for the specific images in those counts. Davila, from Apple, testified about Apple records associated with Stevens'

23

iCloud accounts. Government Exhibit 76, at the Registrations_Device tab, shows that the space gray iPhone X was registered to G.G., with the registration source being iCloud. With that in mind, the evidence showed that G.G. had access to Stevens' digital devices and online accounts based on his access to her iCloud account and through the use of the Apple Keychain program. G.G. lived in the house and had regular access to Minor N. Government Exhibit 78 at the iTunes Updates tab shows that G.G. accessed Kik, Mega, Gmail, Hangouts, and Google Drive multiple times from October to December 2018—the relevant time period to counts two through five. Nonetheless, Agent Ruiz did nothing to investigate G.G., despite the fact that Stevens was not in any of the photos with Minor N.

In addition, on cross-examination it became apparent that Agent Ruiz lacked the requisite knowledge and expertise to reliably testify about the embedded data in the images and videos. Although Agent Ruiz testified that he reviewed some file properties, such as EXIF data, he failed to review the raw data for any of the images or videos. Agent Ruiz admitted that the raw data could show key information, such as whether files had been altered with Photoshop or other programs. Agent Hornberger testified that he could have reviewed the raw data of the images and videos using Encase or similar reader software. But he was never asked to do so. The result is that no one ever viewed the raw data of any of the files. In the absence of a review of the raw data, it is not possible to know for certain when the images and videos here were created.

As to Minor N specifically, this lack of raw data review casts doubt on the embedded date and time information in each image. It's also not possible to know who took the photos. Given G.G.'s access to Stevens' iPhone and online accounts as well as his access to Minor N, it is entirely possible that he took some or all of the photos of Minor N. Although Stevens admitted to taking some photos of Minor N, there were far more photos of Minor N than what Stevens discussed with Agent Ruiz. As a result, the

24

evidence shows that G.G. may have taken some or all of the photos, and also shows that Stevens may well have been covering for G.G. in order to protect him or out of fear for what G.G. may do if she were to explain his involvement. The government's failure to properly investigate G.G. and rule him out as a suspect in combination with the unreliability of the metadata in the photos of Minor N leaves the government unable to meet its burden of proving counts two through five beyond a reasonable doubt. The Court should acquit on those counts.

The Court should also acquit Stevens of count three specifically because there is no reliable evidence of when the photos for that count were taken. Agent Ruiz testified that there is no metadata at all for the photos from November 4, 2018, and thus no way to know their creation date. The government relies solely on the file names of those photos. But Agent Ruiz testified that file names can easily be changed. Thus, there is no reliable information about when those photos were taken; for instance, they very well could have been taken along with other photos from count two that were purportedly taken on October 31, 2018. For that reason alone, the Court should acquit Stevens on count three.

The government has also failed to meet its burden as to counts six and seven. Although those counts are qualitatively different because they involved Minor A and Stevens was visible in some of the videos, the problems with the reliability of the metadata as to those files is fatal to the government's case. As to count seven, because the government cannot establish for certain when those files were created, it is possible they were created during the same time as the files in count six. And for the files in count six, the government has not proven with certainty that those files were created on May 22, 2019. Because G.G. had access to Stevens' iPhone and online accounts, and Agent Ruiz's knowledge and understanding of embedded data is severely lacking and unreliable, it is possible that the files in count six were created on a different date than the one alleged in the indictment. Given the government's high burden of proof and the

25

doubts about when and how the videos and photos of Minor A were created, the Court should acquit Stevens on counts six and seven.

Moreover, even for the videos where Stevens is visible, the government failed to prove that Stevens is the one who filmed those videos. Given the camera angle and what is visible in each video, it appears someone else filmed at least some of the videos. As a result, the government did not establish that Stevens herself had the purpose of producing a visual depiction of Minor A.

### 2.  The images for counts two through four involving Minor N do not constitute sexually explicit conduct.

"Sexually explicit conduct" includes sexual intercourse, bestiality, masturbation, sadistic or masochistic abuse, or "lascivious exhibition of the genitals or pubic area of any person[.]" 18 U.S.C. § 2256(2)(A). The images at issue here could only arguably fall within the last of these criteria (§ 2256(2)(A)(v)). The Ninth Circuit has generally looked to six factors (the *Dost* factors) as a "starting point for determining whether a particular image is lascivious[:]"

> "1)  whether the focal point of the visual depiction is on the child's genitalia or pubic area;
>
> 2)  whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;
>
> 3)  whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
>
> 4)  whether the child is fully or partially clothed, or nude;
>
> 5)  whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;
>
> 6)  whether the visual depiction is intended or designed to elicit a sexual response in the viewer."

*United States v. Perkins*, 850 F.3d 1109, 1121 (9th Cir. 2017) (quoting *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), *aff'd*, *United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987)). These "factors are neither exclusive nor conclusive, and courts may consider any other factor that may be relevant in a particular case." *Id*. (cleaned up).

The D.C. Circuit recently rejected the *Dost* approach in *United States v. Hillie*, 39 F.4th 674 (D.C. Cir. 2022). It carefully reviewed the relevant Supreme Court precedent and concluded that it requires construing § 2256(2)(A)(v) "to mean that the minor displayed his or her anus, genitalia, or pubic area in a manner connoting that the minor, or any person or thing appearing with the minor in the image, exhibits sexual desire or an inclination to engage in any type of sexual activity." *Id*. at 681-85. It then provided "several reasons why *Dost* is unpersuasive." *Id*. at 686-90. Stevens agrees with the D.C. Circuit's interpretation of § 2256(2)(A)(v). To the extent the Court nevertheless feels bound by Ninth Circuit precedent to apply the *Dost* factors, it should keep in mind that (as the trier of fact in this case), it can still consider any relevant factors, and its ultimate task "is simply to make a common-sense decision" given "the image as a whole." *Perkins*, 850 F.3d at 1121-22 & n.9 (cleaned up).

Even under the *Dost* factors, "not all images of nude children are pornographic." *Perkins*, 850 F.3d at 1122 (cleaned up). "For example, consider a photograph depicting a young girl reclining or sitting on a bed, with a portion of her genitals exposed. Whether this visual depiction contains a 'lascivious exhibition of the genitals' will depend on other aspects of the photograph." *Dost*, 636 F. Supp. at 832. If "the girl is wearing clothing appropriate for her age and is sitting in an ordinary way for her age, the visual depiction may not constitute a 'lascivious exhibition' of the genitals, despite the fact that the genitals are visible." *Id*. Put another way, if "the image lacks any traits that would make it sexually suggestive"—in other words, the photo would be

27

1  "unremarkable" if the subject were clothed—then it does not depict the "lascivious

2  exhibition of the genitals or pubic area." *Perkins*, 850 F.3d at 1122.

3      For counts two, three, and four, the images at issue show either a close up of Minor

4  N's vagina or buttocks, or show Minor N lying nude on her back. *See* Gov't Exs. 27,

5  28, 29, 31, 32; Gov't Trial Memorandum, Dkt. 76, at 15-16. Although her genitalia are

6  visible in the photos, she is not displaying "her anus, genitalia, or pubic area in a

7  manner connoting that the minor, or any person or thing appearing with the minor in

8  the image, exhibits sexual desire or an inclination to engage in any type of sexual

9  activity." For the photos where she is lying on her back on a bed, Minor N is nude, but

10  does not do anything to show a sexual desire or inclination to engage in any type of

11  sexual activity. And for the photos that involve closeups of the vagina or anus, the

12  images do nothing more than show those parts of the body. Without an additional

13  component to the photos that indicate a sexual desire or inclination to engage in sexual

14  activity, the fact of the genitalia occupying the space of the photo alone does not make

15  it sexually explicit conduct.

16      Accordingly, those images cannot serve as a basis for counts two through four.

17  **D. The Court should find Stevens not guilty on count eight.**

18      Count eight alleges a violation of 18 U.S.C. § 2252A(a)(2)(A). Dkt. 70 at 4. As

19  discussed above, the evidence showed that G.G. had access to Stevens' iPhone and

20  online accounts, and also showed the unreliability of Agent Ruiz's testimony about the

21  metadata in the images and videos of Minor N and Minor A. With those realities in

22  mind, the evidence shows that G.G. may have sent the images of Minor A to Mega user

23  Tommy Pape Pape on June 28, 2019. Because it is possible that G.G. is the one who

24  distributed those images over Mega, the government failed to prove count eight beyond

25  a reasonable doubt, and the Court should acquit on count eight.

26

27

28                                        28

**E.  The Court should find Stevens not guilty on count nine.**

Count nine alleges a violation of 18 U.S.C. § 2252A(a)(5)(B), which makes a criminal of one who "knowingly possesses, or knowingly accesses with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer[.]" The indictment charges a possession (not an accessing) offense; in particular, it alleges that Stevens "knowingly possessed a Mega.nz account linked to her email 'oneandonly7210@gmail.com' ('Mega account'), which contained at least one image of child pornography[.]" Dkt. 70 at 5. "Possession is the fact of having or holding property in one's power; the exercise of dominion over property." *United States v. Flyer*, 633 F.3d 911, 918 (9th Cir. 2011) (cleaned up). Importantly, § 2252A(a)(5)(B) does not hinge on whether the defendant possessed the child-pornography *images*—the government must prove that the defendant possessed the physical thing *containing the images*. An intangible "account" with a cloud-storage company does not qualify because the company, not its customers, exercise dominion over the company's servers (the material containing the images). The government therefore failed to prove the requisite possession.

Even if the Court could somehow conclude that Stevens exercised sufficient dominion and control over Mega.nz's servers to constitute possession, venue exists in this district only if those servers are here. The Constitution and the Federal Rules of Criminal Procedure require the government to prosecute an offense in a district where the offense was committed. *See* U.S. Const., Art. III, § 2, cl. 3; U.S. Const., Amend. VI; 18 U.S.C. § 3232; Fed. R. Crim. P. 18. For venue purposes, "the locus delicti of the

charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278 (1999) (cleaned up). This is a two-step process. First, the Court must identify the "essential *conduct* elements" of the offense. *Id*. at 279-80 (emphasis added). They are different from non-conduct "circumstance elements" that cannot support venue. *United States v. Stinson*, 647 F.3d 1196, 1204 (9th Cir. 2011) (citing *Rodriguez-Moreno*, 526 U.S. at 280 n.4). Second, the Court must determine the location where the essential conduct element occurred. *Rodriguez-Moreno*, 526 U.S. at 279. Here, the conduct element is the possession. <u>If</u> Stevens possessed Mega.nz's servers, she could do so only where those servers are physically located. But the government did not prove that any such servers were in the Central District. Instead, Agent Ruiz testified that Mega is located in New Zealand, and presumably its main servers are in New Zealand as well.

For these reasons, the Court should find Stevens not guilty on count nine.

## Conclusion

For the foregoing reasons, the Court should find Stevens not guilty on all counts.