E. MARTIN ESTRADA
United States Attorney
SEAN D. PETERSON
Assistant United States Attorney
Chief, Riverside Branch Office
SONAH LEE (Cal. Bar No. 246024)
Assistant United States Attorneys
Riverside Branch Office
     3403 Tenth Street, Suite 200
     Riverside, California 92501
     Telephone: (951) 276-6924
     Facsimile: (951) 276-6202
                Sonah.Lee@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                UNITED STATES DISTRICT COURT

            FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ED CR No. 19-00377-VAP |
|---|---|
| Plaintiff, | UNITED STATES' SENTENCING POSITION FOR DEFENDANT STEFANI KASEY MARIE STEVENS; EXHIBITS 1-3 |
| v. | |
| STEFANI KASEY MARIE STEVENS, | [EXHIBITS 2 AND 3 FILED UNDER SEAL] |
| Defendant. | Sentencing Date:   May 8, 2023 |
| | Sentencing Time:   9:00 a.m. |
| | Location:   Courtroom of the Hon. Virginia A. Phillips |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorney Sonah Lee, files its
Sentencing Position for defendant Stefani Kasey Marie Stevens.

     This Sentencing Position is based on the attached memorandum of
points and authorities, the accompanying exhibits, the files and
records in this case, and such further evidence and argument as the
Court may wish to consider at the time of sentencing.  The United
States reserves the right to supplement or modify its sentencing

1

position and to respond to defendant or the Probation Office as may become necessary.

The United States respectfully requests that the Court set a separate restitution hearing under 18 U.S.C. § 3664 for 90 days after the sentencing hearing, if necessary.

Dated: April 17, 2023            Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 SEAN D. PETERSON
                                 Assistant United States Attorney
                                 Chief, Riverside Branch Office

                                 _/s/_____
                                 SONAH LEE
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

I.   INTRODUCTION..................................................1

II.  DEFENDANT IS A CHILD SEXUAL PREDATOR.........................2

    A.   Defendant Took Victim A from the Safety and Care of
          Victim A's Parents to Create Infant Sexual Abuse
          Material of Victim A..................................2

    B.   Defendant Created Child Sexual Abuse Material of
          Victim N, a Second Child Who Defendant Was Entrusted
          to Care and Protect..................................7

    C.   Defendant's Child Pornography Collection.................8

III. THE PRESENTENCE REPORT.......................................8

    A.   Defendant's Total Offense Level is a 43..................8

    B.   Defendant is in Criminal History Category I.............10

    C.   Probation Recommended a Sentence of Life Imprisonment....10

IV.  THE UNITED STATES' POSITION ON THE PRESENTENCE REPORT........11

    A.   The Counts of Conviction Do Not Group...................11

    B.   A Five-Level Enhancement Under U.S.S.G. § 4B1.5(b)
          Applies................................................14

    C.   Defendant is Not Entitled to Acceptance of
          Responsibility.........................................16

V.   THE UNITED STATES' RECOMMENDED SENTENCE AND § 3553(a)
    ANALYSIS.....................................................17

    A.   Defendant's Crimes Are Evil.............................17

    B.   Defendant's Characteristics.............................18

    C.   A Life Sentence Avoids Sentencing Disparities...........21

    D.   A Life Sentence is the Only Way to Protect The
          Community..............................................23

    E.   The Court Should Impose Consecutive Sentences on Two
          Counts.................................................24

VI.  RESTITUTION.................................................25

VII. CONCLUSION..................................................25

# TABLE OF AUTHORITIES

Cases

*United States v. Cain*,
   806 Fed. App'x 505 (9th Cir. 2020) ........................ 24, 25

*United States v. Clemans*,
   808 Fed. App'x 509 (9th Cir. 2020) ........................... 12

*United States v. Harrell*,
   CR No. 17-00404-AB (C.D. Cal.) ............................... 22

*United States v. Hughes*,
   173 F.3d 862 (9th Cir. 1999) ................................. 14

*United States v. Kiel*,
   454 F.3d 819 (8th Cir. 2006) ................................. 13

*United States v. Rodriguez*,
   ED CR No. 21-00188-JWH (C.D. Cal.) ........................... 21

*United States v. Weicks*,
   472 Fed. App'x 748 (9th Cir. 2012) ........................... 13

Statutes

18 U.S.C. § 2251A .................................. 11, 12, 21, 22

18 U.S.C. § 2426 ............................................. 15

18 U.S.C. § 3553 .............................. 2, 17, 20, 21, 25

18 U.S.C. § 3664 ........................................... 2, 25

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3    Defendant Stefani Stevens ("defendant") is a child sexual

4   predator who acted out her vile sexual fantasies on a five-month-old

5   infant ("Victim A") and seven-year-old minor ("Victim N").  After

6   taking Victim A from the safety and care of the infant's parents,

7   defendant created child pornography videos and images of herself

8   performing oral sex on and penetrating Victim A.  As opposed to

9   protecting Victim N while Victim N was in defendant's care, defendant

10   spent months producing child sexual abuse material of Victim N,

11   including images of defendant spreading the minor's vagina.  By

12   living out her shocking fantasies on Victim A and Victim N, defendant

13   "shattered" their "child[hood] innocence" and sentenced them to a

14   lifetime of anxiety, depression, and trauma from their videos and

15   images forever circulating online.  (Ex. 1.)  Because defendant poses

16   a danger to children for the rest of her life, a life sentence, while

17   severe, is the only sentence that can ensure that defendant does not

18   shatter any more children's lives.

19    On March 8, 2023, the United States Probation and Pretrial

20   Services Office ("Probation") filed its Recommendation Letter and

21   Presentence Investigation Report ("PSR").  (ECF Nos. 116, 117.)

22   Probation calculated defendant's total offense level under the United

23   States Sentencing Guidelines (the "Guidelines") as 43[1] and criminal

24   history as category I, resulting in a Guidelines range of life

25   imprisonment.  (PSR ¶ 143.)  Probation recommended that the Court

26

27    _____

28    [1] Defendant's total offense level is 56, but under Guidelines § 5A, Application Note 2, an offense level of more than 43 is to be treated as an offense level of 43.

1

impose a custodial sentence of life imprisonment.  (ECF No. 116 at 1.)

Consistent with Probation's recommendation and requests by the victims' parents, the United States respectfully requests that the Court impose a sentence of life in custody, as follows: (1) a term of life on Count One (Obtaining Custody of Minor with Intent to Produce Child Pornography) (the "Obtaining Custody Count"); (2) 360 months' imprisonment on Counts Two through Seven (Production of Child Pornography) (collectively, the "Production Counts"); (3) 240 months' imprisonment on Count Eight (Distribution of Child Pornography) (the "Distribution Count"); and (4) 240 months' imprisonment on Count Nine (Possession of Child Pornography) (the "Possession Count"), as well as $900 in special assessments.

This sentence is sufficient and not greater than necessary under 18 U.S.C. § 3553(a) to accomplish the goals of sentencing.  It fairly balances the nature, circumstances, and seriousness of the offense with defendant's history and characteristics and the need to protect the public, provide deterrence, and promote respect for the law, among other considerations.

## II.  DEFENDANT IS A CHILD SEXUAL PREDATOR

The following is a summary of the facts presented during the October 2022 bench trial.  (*See* ECF Nos. 105-109 (Trial Transcripts).)

### A.  Defendant Took Victim A from the Safety and Care of Victim A's Parents to Create Infant Sexual Abuse Material of Victim A

Defendant acted out her despicable fantasy of having a sexual relationship with a baby on Victim A.  Since at least 2018, defendant wanted a baby to sexually abuse.  Defendant even dreamt of getting

pregnant so that she could have an incestual sexual relationship with her own baby and the baby's father.  For example, on July 5, 2018, defendant told greenponddb42@gmail.com that she "had a nice dream" that defendant "gave birth to a beautiful baby girl and from the second she came out [he] took her and licked her right away."  (Trial Ex.[2] 5.)

By 2019, defendant's desire to play with newborns turned into an obsession.  She was viewing infant sexual abuse material on her Kik account and chatting with other users about it.  (PSR ¶ 15.)  When Kik would disable her account for uploading images depicting infant pornography, defendant would immediately create another Kik account.  (*Id.*; ECF No. 105 at 107:25-108:2, 110:2-4.)  This happened three times in April and May 2019 alone.  (PSR ¶ 15.)  Defendant also continued chatting online about her desire to engage in sexual acts with infants.  For example, on April 7, 2019, defendant asked max6lover9@gmail.com if he would "[g]et [her] pregnant [to] give [her] babies to play with" because she "want[s] to lick baby pussy." (PSR ¶ 16; Trial Ex. 6 at 1.)

In April 2019, defendant came up with a plan to turn her fantasy into reality.  When defendant overheard Victim A's mother talking about her interest in returning to work if she could find appropriate childcare for Victim A, defendant offered to watch Victim A so that Victim A's mother could go back to work.  (ECF No. 105 Tr. at 36:10-25.)  Victim A's mother was "appreciative" at the time, not realizing that defendant was exploiting their "friendship and the trust [Victim

---

[2] "Trial Ex." refers to the exhibits introduced by the United States at trial.  (*Cf.* ECF No. 103 (Exhibit List).)

1  A's mother] had for [defendant]" for defendant's "own sick pleasure."

2  (ECF No. 105 at 41:21-42:3; Ex. 1.)

3      Shortly thereafter, Victim A's mother found a job.  Her first

4  day of work was May 22, 2019, meaning defendant would finally get to

5  "babysit" Victim A.  (ECF No. 105 at 53:13-21.)  The day before

6  defendant's first day babysitting Victim A, May 21, 2019, defendant

7  could not contain her excitement.  While hiding her intent to

8  sexually abuse Victim A from Victim A's mother, defendant told user

9  Tommy Pape Pape on Mega about the true reasons for her excitement:

| ~Time on May 21 | Tommy Pape Pape ("TPP") Chat (Trial Ex. 4) | Victim A's Mother Chat (Trial Ex. 2) |
|---|---|---|
| 1:27 p.m. | **Def:** I can't stop watching the first video !!  **It's getting me excited for watching my niece tomorrow I am going to lick her and can't wait to share it with you** | |
| 2:09 p.m. | | **A's Mother:** So what all do you want me to bring tomorrow for the kids? |
| 2:11 p.m. | | **Def:** Just the usual stuff I have snacks and stuff for Eli. |
| 2:13 p.m. | | **A's Mother:** Ok do you want [Victim A's] chair? |
| 2:17 p.m. | | **Def:** Yes please. |
| 2:25 p.m. | | **A's Mother:** Ok and I'll probably just go get you a tub of formula for you to keep at your house . . . . |
| 2:53 p.m. | | **A's Mother:** Do you [h]ave somewhere for [Victim A] to sleep? |

| | | | |
|---|---|---|---|
| 2:59 p.m. | | | **Def:** I can put her in the middle of my bed with pillows around her u less you don' want that you can bring her play pen |
| 3:34 p.m. | **Def:** It's my brothers kid o can't wait to lick [Victim A] so good mm yes I am so excited!!  Mmm yes baby i loved that video !! Fuck you [know] how to turn me on **just wait till tomorrow i will have a nice video of me licking a 5 month old and licking [Victim A's] ass and pussy** god I can't wait | | |
| 4:04 p.m. | **Def:** [video of Victim A] That's my niece who i will lick tomorrow | | |
| 4:27 p.m. | **Def:** i know **i can't wait to lick her tomorrow** i'll be imagining it's ours | | |
| 4:28 p.m. | **TPP:** I can't wait to see u with her | | |
| 4:28 p.m. | **Def:** Yeah I'll video it all | | |

On May 22, 2019, defendant waited in anticipation.  At 7:52 a.m., defendant told Tommy Pape Pape that she was "waiting on [her] niece to be here she will be here at 12 [p.m.]"  (Trial Ex. 4.) Minutes later, at 8:06 a.m., defendant told Tommy Pape Pape that she would call him "daddy" in her video licking Victim A and reiterated how excited she was about it: "Gosh i am excited can't wait till she's here."  (*Id.*)

About 45 minutes later, at 8:49 a.m., Victim A's mother messaged defendant that Victim A was taking a nap and she would head over after Victim A wakes up.  (Trial Ex. 2.)  Then, at 10:01 a.m., Victim

A's mother messaged defendant that she would be arriving at defendant's home shortly. (*Id.*)

After taking custody of Victim A, defendant wasted no time. By 12:19 p.m., defendant sent Tommy Pape Pape a video of herself naked and Victim A fully clothed sitting on her bed in the master bedroom of her home. (ECF No. 106 at 238:23-239:19.) During the next about 10 minutes, defendant created a series of at least four infant sexual abuse videos between herself and Victim A on her iPhone and shared three of them with Tommy Pape Pape. (PSR ¶¶ 17-20.)

| Trial Ex. | Description of Child Pornography Video of Victim A |
|---|---|
| 51 | In the first video, Victim A is wearing a diaper, size two, with a small blue vertical line on the pelvic area indicating that Victim A urinated in Victim A's diaper. Defendant then removes the front part of the diaper exposing Victim A's genitalia to the camera. Defendant then spreads Victim A's legs apart exposing Victim A's vagina to the camera. Defendant then begins touching Victim A's vagina and partially penetrates Victim A's vagina at times. |
| 50 | Second, after removing Victim A's diaper and exposing Victim A's vagina to the camera, defendant uses her index finger to rub up and down Victim A's exposed vagina. Defendant can be heard talking to Victim A during the video. Towards the end of the video, defendant uses two fingers to spread open Victim A's vagina. |
| 49 | Third, defendant takes a close-up video of herself performing oral sex on Victim A. During the video, defendant is heard saying to the camera, as asked by Tommy Pape Pape, "You like this daddy?" |
| 52 | Finally, defendant creates a second close up video of herself performing oral sex on Victim A. During this video, defendant is heard making noises indicative of pleasure while licking Victim A's vagina. |

Defendant's abuse of Victim A did not stop with these videos. The next month, on June 22, 2019, defendant created at least four close-up child pornography images of herself spreading and

penetrating Victim A's genitalia.  (PSR ¶ 21; Trial Ex. 92 at 1.)
Six days later, on June 28, 2019, defendant sent two of those close-
up images of Victim A to Tommy Pape Pape.  (PSR ¶ 22; Trial Ex. 5 at
31-32.)  Defendant even told him that Victim A's genitalia "taste[s]
great" and reiterated how she "[c]an't wait to have a sexy baby of
[her] own to pl[a]y with daily."  (Trial Ex. 5 at 33.)

**B.  Defendant Created Child Sexual Abuse Material of Victim N, a Second Child Who Defendant Was Entrusted to Care and Protect**

Victim A was not the first child in defendant's care and
protection on which defendant acted out her fantasies.  Between at
least July 2018 and May 2019, defendant was producing child sexual
abuse material of Victim N, another minor who defendant was entrusted
to care for and protect while Victim N's father was working.  A
combination of metadata (*e.g.*, date taken, device used, GPS
location), file properties data (*e.g.*, file name, media created), and
defendant's admissions, establish that defendant created at least 29
child pornography or erotica photographs of Victim N.  (PSR ¶¶ 10-14;
Trial Exs. 5 at 64-66, 12, 92 at 3-5.)

Defendant groomed Victim N during that time.  Defendant coached
Victim N how to lay in bed and position herself with her legs up and
spread apart so that defendant could take close-up photographs of
Victim N's genitalia.  (PSR ¶¶ 10-13.)  As Victim N explained,
defendant "told [Victim N] to hold [Victim N's] legs up" and then
defendant would "move[] [Victim N's] legs around" and "move some
skin" before taking the close-up photographs of Victim N's genitalia.
(Trial Ex. 101.)  Grotesquely, defendant trained Victim N that
whenever she said "spread," Victim N would "know what to do."  (*Id.*)

1    Defendant chatted online with other like-minded users about her

2    sexual abuse of Victim N.  For example, in a July 13, 2018 chat with

3    greenponddb42@gmail.com, defendant sent naked photographs of Victim N

4    and wrote, "Baby I got to play with my 8 y[r] old niece today," "she

5    let me touch her and it was so amazing !!," and "[s]he did let me

6    [p]ut my finger in her as well but I was [i]n the moment I forgot to

7    take a picture and she giggles the whole time[.]"  (PSR ¶ 8; Trial

8    Ex. 5 at 64-66.)  By way of additional example, on May 11, 2019,

9    defendant told ea79jr@gmail.com how she "lick[s] and finger[s]"

10   Victim N "[e]very night before bed."  (Trial Ex. 7 at 3.)

C.   **Defendant's Child Pornography Collection**

11

12   Defendant was a collector.  From October 25, 2018 -- when

13   defendant setup her Mega account -- to November 8, 2019 -- the date

14   defendant was arrested -- defendant accumulated 13.78 gigabytes of

15   content in her account, which included more than 1,700 suspected

16   child pornography videos and images.  (PSR ¶ 23; Trial Ex. 92 at 7.)

17   She even neatly catalogued the child pornography in her Mega account,

18   such as in a folder titled "love," dedicated to the child pornography

19   she created of Victim A, a folder titled "daughter [Victim N's

20   mother]," dedicated to the child pornography she created of Victim N,

21   among many other folders with names like "favorites," "best," and

22   "new love," which all contained child pornography.

23   **III. THE PRESENTENCE REPORT**

24   On March 8, 2023, the U.S. Probation Office disclosed the PSR to

25   the parties and issued its Recommendation Letter.  (ECF Nos. 116,

26   117.)

A.   **Defendant's Total Offense Level is a 43**

27

28   Probation concluded that the total offense level is 43, which it

8

calculated by first determining the adjusted offense level for each count:

| Count | Base Offense Level | Specific Offense Charact. | Adjusted Offense Level |
|---|---|---|---|
| Count One (Obtaining Custody of Minor with Intent to Produce Child Pornography) (Victim A) | 38 | N/A | 38 |
| Count Two (Production of Child Pornography) (Victim N) | 32 | +8 | 40 |
| Count Three (Production of Child Pornography) (Victim N) | 32 | +10 | 42 |
| Count Four (Production of Child Pornography) (Victim N) | 32 | +10 | 42 |
| Count Five (Production of Child Pornography) (Victim N) | 32 | +8 | 40 |
| Count Six (Production of Child Pornography) (Victim A) | 32 | +14 | 46 |
| Count Seven (Production of Child Pornography) (Victim A) | 32 | +14 | 46 |
| Count Eight (Distribution of Child Pornography) (Victim A) | 22 | +15 | 37 |
| Count Nine (Possession of Child Pornography) | 18 | +20 | 38 |

(PSR ¶¶ 35-116.)

Probation then adjusted for multiple counts under U.S.S.G. § 3D1.4, resulting in a combined adjusted offense level of 51. (*Id.* ¶¶ 117-120.)

Next, Probation increased the combined adjusted offense level by five levels, from 51 to 56, under U.S.S.G. § 4B1.5(b) because defendant's convictions involve a covered sex crime, neither U.S.S.G. § 4B1.1 nor subsection § 4B1.5(a) applies, and the defendant engaged

in a pattern of activity involving prohibited sexual conduct.  (*Id.*
¶¶ 121-123.)

Thus, Probation calculated defendant's total offense level as
56, meaning defendant's conduct is 13 levels *more severe* than the
maximum total contemplated by the Guidelines' Sentencing Table.  (PSR
¶ 123.)  According to the United States Sentencing Commission, an
offense level above a 43 is "extremely rare" and should be treated as
a level 43 for purposes of the Sentencing Table.  U.S.S.G. § 5A,
Application Note 2.

**B.   Defendant is in Criminal History Category I**

The PSR concluded that defendant is in criminal history category
I because defendant had a criminal history score of one, based on a
2011 Petty Theft misdemeanor conviction.  (PSR ¶ 130.)

**C.   Probation Recommended a Sentence of Life Imprisonment**

With a total offense level of 43 and a criminal history category
of I, Probation determined that defendant falls within a guideline
imprisonment range of life.  (PSR ¶ 173.)

In its Recommendation Letter, Probation recommended the
following sentence: (1) a lifetime custodial sentence consisting of a
term of life on Count One (Obtaining Custody Count), 360 months'
imprisonment on Counts Two through Seven (Production Counts), and 240
months' imprisonment on Count Eight (Distribution Count) and Count
Nine (Possession Count), all to be served concurrently; (2) $900 in
special assessments, and (3) that all fines be waived.  (ECF No. 116
at 1.)  If the Court decides to impose a custodial sentence less than
life, then Probation recommended that the Court impose a supervised
release term of life with various restrictions.  (*Id.* at 1-2.)

1    **IV.   THE UNITED STATES' POSITION ON THE PRESENTENCE REPORT**

2         The United States agrees with Probation's guideline calculations

3    set forth in the PSR, including its determination that (1) none of

4    the counts of conviction should be grouped, (2) an enhancement under

5    U.S.S.G. § 4B1.5(b) applies, and (3) defendant is not entitled to a

6    reduction for acceptance of responsibility.[3]

7         **A.   The Counts of Conviction Do Not Group**

8         None of the nine counts of conviction group under U.S.S.G.

9    § 3D1.2.

10        ***The Obtaining Custody Count Does Not Group.***  The Obtaining

11   Custody Count does not group with any of the other counts.

12   Application Note 4 of U.S.S.G. § 3D1.2 explains that the Guidelines

13   do "not authorize the grouping of offenses that cannot be considered

14   to represent essentially one composite harm."  Here, the Obtaining

15   Custody Count involved a separate and distinct harm on Victim A than

16   the associated Production Count (Count Six).  Specifically, while the

17   Production Count creates a permanent record of Victim A's sexual

18   abuse on the Internet that will forever haunt and re-victimize Victim

19   A, the Obtaining Custody Count additionally and distinctly entails

20   the more severe trauma that results from the removal of Victim A from

21   the care and protection of her parents to sexually abuse her through

22   hands-on contact.

23        The Ninth Circuit has upheld sentences in which the district

24   court did not group a violation of 18 U.S.C. § 2251A(b).  For

25   _____

26        [3] The United States discusses the reasons it agrees with these
     three determinations because defendant stated that she will likely
27   object to them in her *Ex Parte* Application to Continue Sentencing
     Hearing.  (*See* ECF No. 118 ¶ 4.)  If defendant raises additional
28   objections or arguments, the United States reserves the right to file
     additional briefing in response.

example, on appeal in *United States v. Clemans*, defendant claimed the district court erred by not grouping his conviction under 18 U.S.C. § 2251A(b) with the related conspiracy and production counts. *See United States v. Clemans*, 2019 WL 1025379, at *48-49 (9th Cir. Feb. 25, 2019) (Appellant's Opening Brief); *United States v. Clemans*, 2019 WL 3855473, at *80-81 (9th Cir. Aug. 9, 2019) (United States' Answering Brief). Although the Ninth Circuit did not decide the issue, it upheld the sentence because, even assuming a violation of 18 U.S.C. § 2251A(b) should have grouped, defendant's total offense level would still have exceeded 43. *United States v. Clemans*, 808 Fed. App'x 509, 510-11 (9th Cir. 2020.) The same is true here. Probation assigned 0.5 units to the Obtaining Custody Count. (PSR ¶ 117.) Thus, even if the 0.5 units were deducted from the total number of units assigned (six), defendant would still receive a five-level increase in offense level under U.S.S.G. § 3D1.4 and still have a total offense level exceeding 43 before the § 5A adjustment.

   ***The Production Counts Do Not Group***. The six Production Counts also do not group. U.S.S.G. §§ 2G2.1(d) and 3D1.2 confirm this. Section 2G2.1(d) says that "multiple counts involving the exploitation of different minors are not to be grouped together under § 3D1.2 (Groups of Closely Related Counts)." U.S.S.G. § 2G2.1(d), Application Note 7. So, as a starting point, Counts Two through Five (the Production Counts for Victim N) do not group with Counts Six and Seven (the Production Counts for Victim A) because they involve two different victims.

   Additionally, Section 3D1.2 is unambiguous that the Production Counts do not group for at least two reasons. First, that section specifically excludes from grouping offenses covered by Section

2G2.1, which is the applicable Guidelines section for the Production

Counts.  Second, as discussed above, that section "does not authorize

the grouping of offenses that cannot be considered to represent

essentially one composite harm."  U.S.S.G. § 3D1.2(d)  For example,

where "[t]he defendant is convicted of two counts of raping the same

person on different days.  The counts *are not* grouped together."

(*Id.*, Application Note 4 (emphasis in original).).

Therefore, the six Production Counts do not group under Section

3D1.2 because they are expressly excluded from grouping and do not

represent one composite harm -- each production represents a

different harm.  *See United States v. Kiel*, 454 F.3d 819, 822 (8th

Cir. 2006) (holding that "the district court properly refused to

group the Production Counts.  Each time that Kiel molested a child,

he inflicted a separate and distinct harm upon that child; therefore,

his actions cannot be considered substantially the same harm for

grouping purposes under § 3D1.2."); *United States v. Weicks*, 472 Fed.

App'x 748, 749 (9th Cir. 2012) (refusing to group two trips to Las

Vegas resulting in sexual abuse of the same victim, which took place

eight days apart as separate episodes of criminal conduct).

***The Distribution and Possession Counts Do Not Group.***  The

Distribution and Possession Counts also do not group with any other

counts because they involve different types of harms and victims.

Although the United States recognizes that Section 3D1.2 says that

offenses covered by Section 2G2.2 -- the applicable Guideline section

for the Distribution and Possession Counts -- are to be grouped

together, that is not required.  Here, the Distribution Count

involved defendant distributing two child pornography images of

Victim A to a like-minded user on June 28, 2019, and the Possession

13

Count involved defendant's possession of a Mega account containing over 1,700 suspected child pornography images and videos, including not only of Victim A and Victim N, but also of many other children. *See United States v. Hughes*, 173 F.3d 862 (9th Cir. 1999) (district court properly refused to group receiving child pornography and possessing child pornography because receiving child pornography does not take into account the volume of pornographic images involved).

In any event, whether the Distribution and Possession Counts are grouped has no effect on defendant's total offense level because Probation assigned zero units to the Distribution Count and 0.5 units to the Possession Count Nine. Thus, like discussed for Count One (the Obtaining Custody Count), even if the Court were to find that one or both counts should group, it would not change defendant's total offense level because of the § 5A adjustment to level 43.

**B.   A Five-Level Enhancement Under U.S.S.G. § 4B1.5(b) Applies**

Defendant's combined offense level should be increased by five levels, from a 51 to a 56, under Section 4B1.5(b).  Under that section, in any case in which (1) the defendant's instant offense of conviction is a covered sex crime, (2) neither Section 4B1.1 nor subsection 4B1.5(a) applies, and (3) the defendant engaged in a pattern of activity involving prohibited sexual conduct, the offense level determined under Chapters Two and Three must be increased by five levels.  All three of these requirements are met.

First, defendant's convictions for Counts One through Eight are covered sex crimes.  Application Note 2 says that a "covered sex crime" includes offenses perpetrated against a minor under Chapter 110 of such title, not including trafficking in, receipt of, or possession of, child pornography, or a recordkeeping offense.  Here,

Counts One through Eight concern crimes perpetrated against Victim A and Victim N -- both minors -- and do not fall within the list of excluded crimes (*e.g.*, trafficking in, receipt of, or possession of, child pornography).

Second, Section 4B1.1 does not apply because defendant is not a Career Offender under the Guidelines. Section 4B1.5(a) also does not apply because defendant does not have a prior sex offense conviction before this case.

Lastly, defendant engaged in a pattern of activity involving prohibited sexual conduct. Application Note 4(A) defines "prohibited sexual conduct" to include (i) an offense described in 18 U.S.C. §§ 2426(b)(1)(A) or (B) and (ii) production of child pornography, but clarifies that it does not include a defendant's receipt or possession of child pornography. Moreover, Application Note 4(B)(i) says that for purposes of U.S.S.G. § 4B1.5(b), the defendant engages in a pattern of activity involving prohibited sexual conduct if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor. Here, defendant engaged in prohibited sexual conduct on at least two separate occasions with both Victim A and Victim N. In particular, defendant created child pornography videos of herself performing oral sex on Victim A on May 22, 2019 (Count Six) and produced child pornography images of herself spreading Victim A's vagina on June 22, 2019 (Count Seven). Defendant also created child pornography images of Victim N on or about at least October 31 (Count Two), November 4 (Count Three), November 12 (Count Four), and November 13, 2019 (Count Five).

**C.    Defendant is Not Entitled to Acceptance of Responsibility**

Defendant is not entitled to a two-level decrease in her offense level for acceptance of responsibility under U.S.S.G. § 3E1.1(a). Section 3E1.1(a) is not intended to apply here because defendant put the United States to its burden of proof at trial.  Application Note 2 is unambiguous -- "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilty and expresses remorse."

Nor is this one of the "rare situations" where a defendant accepts responsibility for her criminal conduct even though she exercised her right to a trial.  Application Note 2 helps guide this assessment.  It explains that the "rare situation[]" should be determined "based primarily upon pre-trial statements and conduct." U.S.S.G. § 3E1.1, Application Note 2.  For example, "where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)."  *Id.*  In contrast to this example, defendant contested each and every count at trial.  *See, e.g.*, ECF No. 95 (defendant's post-trial brief challenging defendant's guilt on every count).

But more importantly, to this day, defendant has never truthfully admitted the full scope of her criminal conduct. Defendant refuses to admit that she created this child pornography for her self-pleasure.  As discussed further below, *infra*, Section V.B, the evidence presented at trial established that defendant created child sexual abuse material of two children for her own personal enjoyment.  Defendant does not even admit that fundamental

16

fact and, therefore, is not entitled to acceptance of responsibility. In any event, even assuming defendant was, her total offense level would only be decreased from a 56 to a 54, meaning it would have no effect on her Guidelines range because of the § 5A adjustment.

## V.   THE UNITED STATES' RECOMMENDED SENTENCE AND § 3553(a) ANALYSIS

The United States recommends that the Court impose a custodial sentence of life on defendant.  Defendant is precisely the type of person for whom a life sentence exists, a remorseless child sexual predator who will pose a grave threat to children for the rest of her life.  Only a life sentence will protect her victims and the children in the larger community from defendant, adequately punish her for her extraordinary crimes, and provide the specific and general deterrence necessary for her crimes.

### A.   Defendant's Crimes Are Evil

Defendant's conduct is abhorrent.  Defendant acted out her sexual fantasies on not one, but two children, including an infant.

As summarized in Section II, *supra*, and presented at trial, defendant took a five-month-old infant from the safety, care, and protection of the infant's mother so that defendant could sexually abuse the infant.  As Victim A's mother said, defendant, "was trusted to protect [Victim A]," but instead "violated [Victim A] in ways [Victim A] didn't even understand[.]  Was [Victim A] crying for [Victim A's mother] because [Victim A] wanted to go back to the safety [Victim A] knew [Victim A] needed?  [Defendant] let [Victim A] believe [Victim A] could trust [defendant] and [defendant] would take care of [Victim A], but instead, [defendant] showed [Victim A] how sick and cruel people in this world can be."  (Ex. 1.)

1    Having even one child violated in this way is too many, but

2    defendant also created child sexual abuse material of Victim N for

3    months while Victim N was left in defendant's care because Victim N's

4    father was working.  Defendant produced close-up photographs of

5    Victim N's genitalia and other sexually explicit photographs of

6    Victim N lifting and spreading her legs up in the air.  In an

7    unspeakably evil course of conduct, defendant trained Victim N that

8    the word "spread" required Victim N to lay on her back and spread her

9    legs so that defendant could create child pornography images of

10   Victim N.  Because of Victim N's age, these are memories and

11   experiences that will haunt her for the remainder of her life.

12       This conduct is among the most serious a criminal defendant can

13   commit and her sentence should reflect that.

14   **B.    Defendant's Characteristics**

15       Defendant's characteristics also support a lifetime custodial

16   sentence.  Particularly troubling to the United States is that

17   defendant "denies that her involvement in the instant offense was for

18   self-pleasure" and, instead, suggests that she was merely trying to

19   "make others happy" or was "threatened" to do it.  (PSR ¶ 149.)

20   These suggestions are incredulous given the mountain of evidence

21   proving defendant has a sexual interest in children.  And, even if

22   true, they support the same sentence to prevent her from "mak[ing]

23   others happy" in the future.

24       The child pornography videos defendant produced speak for

25   themselves.  (Trial Exs. 49-52.)  Those videos reflect a woman who is

26   in bliss, as evidenced from the noises that defendant makes

27   expressing her sexual satisfaction while performing oral sex on

28   Victim A (ECF No. 106 at 222:16-17) to the statements defendant makes

18

while doing it (*id.* at 238:16-19).  There is no specter in the videos or evidence in this case that show a woman who is disgusted by her actions or is an automaton performing for others.

Defendant's online chats further prove she was acting for her personal enjoyment.  (Trial Exs. 4-10.)  For example, in her online chat with Tommy Pape Pape, defendant repeatedly wrote how "excited" she was to be able to perform oral sex on a baby.  (Trial Ex. 4.) Indeed, defendant's online chats show it was defendant who was the one seeking out other like-minded users to communicate with about child pornography.  Consider the following examples: (1) on April 7, 2019, after max6lover9@gmail.com told defendant that he does not like babies and prefers "only 18+," defendant responded, "okay then mayb[e] your not for me" (Trial Ex. 6 at 1); and (2) on May 11, 2019, after speaking with ea79jr@gmail.com about "poo and pee" porn, defendant asked if ea79jr@gmail.com liked "young or incest."  (Trial Ex. 7 at 4; *see also* Trial Ex. 10 at 80 (defendant shifts chat to child pornography, "How do you feel [a]bout young?").)

There is more proof in defendant's collection.  If defendant was truly "disgusted" (PSR ¶ 149) by child pornography she would not have obtained and categorized 13.78 gigabytes of content in her Mega account, which included more than 1,700 suspected child pornography videos and images.  (PSR ¶ 23; Trial Ex. 92 at 7.)  The organization shows a labor of love, including (1) a folder called "love," dedicated to the infant sexual abuse material defendant created of Victim A, (2) a folder called "daughter [Victim N's mother]," dedicated to the child sexual abuse material defendant created of Victim N, and (3) many other folders like "favorites," "best," and "new love."  The intuitive inference and conclusion is that defendant

creates, distributes, and possesses child pornography for her own pleasure and gratification at the expense of vulnerable victims.

To be clear, there is zero evidence that defendant created child pornography because she was threatened.  Special Agent Ruiz was asked at trial, "based on your review of defendant's Mega account, which included the conversation with Tommy Pape Pape, did you see any indication of any -- any threats being made to defendant in connection with the videos that were created of [Victim A] on or around May 22, 2019," and he answered, "No, I did not."  (ECF No. 106 at 262:18-24; Trial Exs. 4, 21.)

In short, that defendant still denies her sexual interest in children shows she is a person who will always pose a substantial threat to the safety of children and society.

Defendant's upbringing and family life also do not support a downward variance.  Defendant was fortunate to have a loving and caring family who provided all of life's basic necessities for her and, at times, much more.  (PSR ¶ 138.)  Although defendant claims that her parents paid more attention to her brother than her, that claim is contradicted by defendant's mother who believed defendant's parents "actually were more attentive to [defendant] than with her brother."  (*Id.* ¶ 139 n.4.)  Additionally, while defendant may have mental health issues and suffered a traumatic sexual event in the past (*id.* ¶¶ 140, 148-154), those mitigating factors come nowhere near warranting the more than 13-level downward variance needed to change defendant's Guideline range from "off the charts" to "on the charts."

At bottom, when considering the Section 3553(a) factors, defendant's characteristics support a life sentence and her claimed

family and mental health issues do not meaningfully change the calculous -- the Court should impose a life sentence.

### C.   A Life Sentence Avoids Sentencing Disparities

Section 3553(a)(6) requires a court to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty for similar conduct."  As the Court learned during trial, and as shown by a total offense level of 56, defendant is in a league of her own.  Nevertheless, a review of sentences involving convictions for Obtaining Custody of a Minor with Intent to Produce Child Pornography under 18 U.S.C. § 2251A(b) show that a life sentence for defendant is commensurate and satisfies the purposes of sentencing.  Indeed, at least two courts in this District have recently sentenced defendants to life imprisonment after they pled guilty to violations of 18 U.S.C. § 2251A(b).

1.   In *United States v. Rodriguez*, ED CR No. 21-00188-JWH (C.D. Cal.), that defendant was a caregiver in a group home for disabled children who created child pornography of himself and multiple minor children as young as 6 years old.  (*Id.*, ECF No. 164 at 2-15.)  Under a plea agreement, defendant pled guilty to eight counts, including one count of Obtaining Custody of a Minor for Purposes of Producing Child Pornography and five counts of Production of Child Pornography.  (*Id.*, ECF No. 155.)  Like here, that defendant's Guideline range was calculated to be life imprisonment based on a total offense level of 56 and a criminal history category I.  (*Id.*, ECF No. 164 at 22.)  Based on that defendant's Guideline calculations and "unspeakable acts," as described by the district court at the sentencing hearing, the district court sentenced defendant to a term of life imprisonment.  (*Id.*, ECF No. 176.)

1          2.     In *United States v. Harrell*, CR No. 17-00404-AB (C.D.

2    Cal.), the defendant created sexual abuse material of twenty victims,

3    ranging from babies to nine-year-olds, and shared the material on the

4    dark web.  (*Id.*, ECF No. 367 at 1.)  Defendant pled guilty to twenty-

5    three counts, including one count of Obtaining Custody of a Minor for

6    Purposes of Producing Child Pornography, seventeen counts of

7    Production of Child Pornography, and one count of Possession of Child

8    Pornography.  (*Id.*, ECF No. 296.)  Similar to here, that defendant's

9    Guideline range was calculated to be life imprisonment based on a

10   total offense level of 53 and a criminal history category I.  (*Id.*,

11   ECF No. 367 at 29.)  The district court concluded that this conduct

12   warranted a life custodial sentence.  (*Id.*, ECF No. 377.)

13         While these two recent cases remain on appeal in case numbers

14   23-50024 (*Rodriguez*) and 22-50035 (*Harrell*), the Ninth Circuit has

15   upheld life imprisonment sentences in similar cases where the

16   defendant's Guideline range was life.  For example, in *United States*

17   *v. Clemans*, the defendant would send money to a Philippine national,

18   who would make sexually explicit photos of minor girls in the

19   Philippines, and send the photos to the defendant so that he could

20   identify the minors he wanted to travel to the Philippines to

21   sexually abuse.  (2:15-cr-00227-JAM (E.D. Cal.), ECF No. 110 at 3-4.)

22   Following a jury trial, defendant was convicted of, among other

23   crimes, Obtaining Custody of a Minor with Intent to Produce Child

24   Pornography under 18 U.S.C. § 2251A(b).  (*Id.* at 2-3.)  The district

25   court sentenced defendant -- who had a total offense level of 50 (*id.*

26   at 12) -- to a term of life imprisonment.  (*Id.,* ECF No. 116.)  On

27   appeal, the Ninth Circuit affirmed the district court's sentence of

28   life imprisonment, reasoning that even if the Ninth Circuit assumed

1   the district court erred at sentencing in the ways suggested by

2   defendant, defendant still would have had a Guideline range of life

3   imprisonment because his total offense level still would have

4   exceeded 43.  808 Fed. App'x 509, 510-11 (9th Cir. 2020).

5       Collectively, *Rodriguez*, *Harrell*, and *Clemans* support that the

6   imposition of a within-Guidelines sentence -- here, a life sentence

7   -- would avoid unwarranted sentencing disparities between defendants

8   who committed similarly evil conduct and had similar Guideline

9   calculations.

10      **D.   A Life Sentence is the Only Way to Protect The Community**

11      There is no way to protect the community from defendant other

12  than incarceration given defendant's sexual desire in children and

13  repeated willingness to act on that desire.  Although defendant has

14  presented reports from a clinical psychologist and clinical

15  neuropsychologist to claim that defendant is unlikely to become a

16  repeat offender (PSR ¶ 154), those reports are not persuasive because

17  they do account for the evidence discussed above.  The clinical

18  neuropsychologist did not consider any discovery produced in this

19  case (Ex. 2 at 1), and while the clinical psychologist claimed he

20  based his report on a portion of the discovery materials, he ignores

21  important pieces of evidence.  (Ex. 3 at 2.)  For example, the

22  clinical psychologist conclusion is based on an "absence of any prior

23  indications of sexual interest in" children when, in fact, the

24  materials the clinical psychologist claimed to have reviewed are

25  filled with such examples.  (*Id.* at 10.)

26      Without meaningful consideration and discussion of the evidence

27  in this case, the clinical psychologist and clinical

28  neuropsychologist reports do not tilt the needle away from the need

1  for a life sentence to avoid defendant victimizing more children and

2  to adequately punish her for her crimes.  As Congress found in

3  enacting the Amy, Vicky, and Andy Child Pornography Victim Assistance

4  Act of 2018, the harms caused by child pornography *begin*, but do not

5  *end*, with child sexual assault because child pornography is a

6  permanent record of that abuse and trafficking in those images

7  compounds the harm to the child.  *See*  Pub. L. No. 115-299, 132 Stat.

8  4384 (2018).  By creating child sexual abuse material of Victim A and

9  Victim N, defendant imposed her own life sentence on the victims.  A

10  lifelong prison sentence is the singular way to guarantee that

11  defendant does not subject any more children to such life sentences

12  and to deter other like-minded individuals from similarly acting out

13  on their grotesque fantasies and obsessions.

14      **E.  The Court Should Impose Consecutive Sentences on Two Counts**

15      The Court should exercise its discretion to impose consecutive

16  sentences on Counts Two (Victim N) and Six (Victim A) of the

17  Production Counts, such that it would be a total term of 720 months'

18  imprisonment on those two counts and they would run concurrently to

19  defendant's life sentence on the Obtaining Custody Count.  This

20  considers the unique harms on two victims and the revictimization

21  that will come from their child pornography being on the Internet.

22      As the Ninth Circuit explained in *United States v. Cain*, "the

23  Guidelines do not require concurrent sentencing and it is squarely

24  within the discretion of the district court to determine whether to

25  impose concurrent or consecutive sentences."  806 Fed. App'x 505, 509

26  (9th Cir. 2020).  The Ninth Circuit continued: "'in determining

27  whether the terms imposed are to be ordered to run concurrently or

28  consecutively,'" the district court "'shall consider, as to each

offense for which a term of imprisonment is being imposed, the factors set forth in [§] 3553(a).'"  (*Id.* (citing 18 U.S.C. § 3584(b).)

Here, imposing consecutive sentences on two Production Counts -- a Production Count for Victim A and a Production Count for Victim N -- is well within the Court's discretion based on the Section 3553(a) analysis discussed above and given defendant's Guideline range.  For instance, in *Cain*, based on the Section 3553(a) factors, the district court sentenced a defendant to 150 months for possession with intent to distribute methamphetamine to run consecutively to 120 months for being a felon in possession of a firearm, for a total sentence of 270 months.  806 Fed. App'x at 509.  The Ninth Circuit affirmed the consecutive sentences because they were based on consideration of the Section 3553(a) factors and the defendant did not identify any factor the district court failed to consider.  *Id.*

**VI.   RESTITUTION**

To date, all restitution claims expected have not been received, including for Victim A and Victim N.  The United States respectfully requests that the Court defer the restitution hearing for 90 days after sentencing, consistent with 18 U.S.C. § 3664(d)(5).

**VII. CONCLUSION**

"[Defendant is] not a mother.  [She's] not a woman.  [She's] not human."  (Ex. 1.)  Defendant is a "monster."  (*Id.*)  A monster that subjected Victim A and Victim N to the "ugly world" she fantasized about.  (*Id.*)  The Court should sentence defendant to the only term of imprisonment that can ensure that she does not act out her twisted fantasies on another child -- a sentence of life imprisonment and a special assessment of $900.